Carroll,  }
Dec. 3, 1901. }

HORNE & a. v. HUTCHINS.

Where the owners of mills situated upon opposite sides of a stream are in dispute concerning their respective water rights, the controversy may be determined, and the privileges defined, by an award of arbitrators upon an oral submission of the question to them ; and such award is binding upon the parties to the submission and their successors in title.

The fact that prior owners of a mill privilege were parties to a submission for the purpose of determining their water rights may be shown by oral testimony as to their acceptance of a bond from the opposite party to abide by the result, their appearance before the arbitrators, and their subsequent compliance with the award.

Where the right of a mill-owner to make a draft of water is limited by the terms of an award to such times as there shall be a flow over "the present wasteway," parol evidence is admissible for the purpose of establishing the location and dimensions of the wasteway at the date of the award.

If the owner of a mill privilege conveys a portion thereof by a deed which refers to his grantor's deed for a specification of the right conveyed, the privilege granted is to be measured by the description in the prior conveyance, and not by additional rights exercised subsequently thereto.

BILL IN EQUITY, to determine the respective rights of the parties to the water-power at the Pickering dam, so called, across Smith's river in Wolfeborough. The dam and power are the same that are mentioned in the preceding case between the same parties, to which reference may be had for a general description. The other facts necessary to a determination of the questions in the case are stated in the opinion. Transferred from the April term, 1900, of the supreme court by *Parsons*, J., upon a referee's report, without rulings.

*Leslie P. Snow* and *Sewall W. Abbott*, for the plaintiffs.

*James A. Edgerly* and *Arthur L. Foote*, for the defendant.

CHASE, J. There is at the westerly end of the Pickering dam a tract of land with a gristmill upon it, owned by one Flanders. The water privilege attached to this mill is described in the deed creating it as follows : " The privilege of drawing and using water for gristmill standing on westerly side of said stream [Smith's river] whenever there may be water in the stream or mill-pond for that purpose, it being understood that said grist mill is to use the

water for running the machinery now in the same, and any other or additional machinery which may be put into the same or any other gristmill which may be substituted therefor, in preference to any other mills or machinery on said privilege." Flanders is not a party to this suit, and the character and extent of his rights are not before the court for decision. The parties are owners — each of a part in severalty — of all the land on both sides of the river below the dam and the water privilege appertaining to the same, excepting the Flanders or gristmill lot and privilege. It must be understood in what follows that the rights of the several owners are subject to whatever superior or preferential rights are attached to the gristmill or to the privilege as a whole.

There is at the easterly end of the dam, and has been from a time antedating by many years any of the deeds herein mentioned, a sawmill supplied with power by water drawn from the pond through a flume that taps the dam near that end. March 10, 1856, Thompson, the owner of the remainder of the land and privilege aside from the gristmill lot and privilege, conveyed to Horne a lot of land (designated lot F for convenience of reference) on the westerly side of the river, northerly of and adjoining to the gristmill lot, together with " a right to draw water for the use of a bucket or breast wheel twelve feet in diameter, and length of buckets five feet long, out of the bulkhead which said Thompson agrees to build, provided that said Horne shall not at any time draw more than one square foot of water ten feet up from common high water in the lake, and shall not at any time draw any water to waste without being used in the shop he intends to build, or another shop he may build in case of fire; none of said water is understood to be used in manufacturing anything from round timber of any kind. . . . Said Thompson agrees that said Horne shall have an equal right of drawing said water for said wheel down to the bottom place left for the penstock in the dam about four feet from the top of the dam with said Thompson's sawmill and circular board-saw, planing machine, small circular saw machine, edger, etc., said sawmill building and his building north of the gristmill whenever he, his heirs or assigns, may choose to put it in. . . . Said Thompson to make the penstock and bulkhead,— afterwards said Horne, his heirs or assigns, to do one half of the repairs,— which penstock is about four feet from the top of the dam; when the water is high enough in the pond to run into the penstock, then Horne to have water as herein described; when it will not run in he has no right to water." About this time Thompson constructed a penstock running from a hole in the dam near its westerly end, about four feet from the top, and seventeen by twenty-seven inches in size, in a northerly direction

across the gristmill lot and lot F, to the lot (G) owned by Thompson, adjoining lot F on its northerly side. Provision was made for taking the water mentioned in the deed from the portion of the penstock upon lot F, and between that point and the end of the penstock there was a bulkhead. The interior dimensions of the penstock and its capacity for drawing water from the pond have not been ascertained.

Thompson having conveyed to McDuffee the rest of the land and the water privilege owned by him, the latter conveyed to Guptill and Hersey, February 21, 1857, the land on the easterly side of the river and his water rights, reserving to himself and his heirs and assigns " the right to draw and use water out of the dam and pond for the mills and privileges on the westerly side of said stream or mill-pond through the penstock, or one of equal size substituted for the present one, to be inserted no lower down in the dam than the present penstock." The penstock here referred to is the one that was constructed by Thompson as above stated. August 19, 1858, McDuffee conveyed lot G and his water rights to Colby, and November 22, 1864, Colby conveyed the same to Horne. So by the two deeds, Thompson to Horne and Colby to Horne, the latter acquired title to the land (lots F and G) on the westerly side of the river north of the gristmill lot, and all the water rights appertaining to the penstock above mentioned. The limitations in the deed, Thompson to Horne, upon the water right thereby conveyed, were evidently intended to be for the benefit of the privilege to be used in connection with lot G. When the ownership of the two lots (F and G) was united in Horne, these limitations became of no practical consequence. Horne, then, has the right to draw water from the pond for the use of mills upon lots F and G, through the penstock in existence February 21, 1857, or through one of equal size " inserted no lower down in the dam." The penstock was constituted the standard for measuring his right. To determine the extent of the right, it will be necessary to know the size and location of this penstock and its capacity for drawing water. If the penstock has been enlarged, or if it has been changed at its northerly end, thereby increasing its capacity, as the report tends to show, the defendant and other owners in the water privilege at the Pickering dam, are entitled to have it changed so as to conform to the right. These are facts that must be determined in the superior court.

There is another fact which affects the Horne privilege. In 1859 and 1860, Colby owned the gristmill lot and lot G, and the privileges belonging to them respectively; Horne owned lot F and its privilege; and Winthrop D. and George W. Hersey owned the land on the easterly side of the river and the rest of the water

privilege at the Pickering dam. In 1859 the Herseys made a hole in the dam near its easterly end, at about the same level as that of the Horne penstock and of about the same size, and constructed a penstock leading from it under the sawmill (D) to mill (H) erected on their land near this time, some distance northerly of the sawmill, and drew water from the pond through it to mill H. This was a new or additional draft of water from the mill-pond, and occasioned a dispute between the Herseys and Colby. Thereupon, in April, 1860, the Herseys and Colby submitted to arbitrators the question " of and concerning the taking of water " from the mill-pond by this penstock " to be used for manufacturing purposes " on the easterly side of the river, and " of and concerning all controversies between them in regard to the use of the water of said river." Colby gave a bond to the Herseys conditioned to abide by the award. It did not appear that the Herseys gave Colby a correlative bond, nor that they agreed to the submission in writing; but the fact is found by the referee that they were parties to the submission. The finding was based upon the following facts, found from a consideration of oral testimony : the acceptance by them of the Colby bond, their appearance as parties before the arbitrators, and their acceptance of and subsequent compliance with the award. The arbitrators, having notified the parties of the hearing and having heard them, awarded that the Herseys, " their heirs and assigns, now have and forever after shall have the right to take water from the mill-pond at Pickering's mills, so called, in Wolfeborough, by the present penstock, put in by the said Herseys in November, 1859, or by any other penstock of the same dimensions and at the same height and at the same place in case of the destruction of the present one, at all times and none other when the water shall run over the present wasteway betwixt the present sawmill and gristmills, or over a wasteway of the same height and dimensions in case of the destruction of the present mill-dam." Horne was not a party to the submission. The mill now owned by him is on lot G and was at the time of the submission and award, and was then owned by Colby. If the dispute between Colby and the Herseys did not relate solely to the relative water rights appertaining to lot G and to the land on the easterly side of the river, as seems probable from the fact that Colby's gristmill privilege, having preference over other mills in the use of water, would not be likely to cause such a dispute, it must have related in part to those rights. The water rights of lot G were certainly involved in the dispute.

The penstock, being the means used to make the extra draft of water from the pond, was specially mentioned in the submission and award; but it is evident that it was regarded as the physical

representative of the right in dispute,— that is, the right of the owners on the easterly side of the river, as against the owner of lot G, to draw water in addition to what had been usually drawn for the sawmill machinery. The question submitted to the arbitrators related to the boundary between the two rights. It did not involve a transfer of any portion of one right to the other. The parties were not restrained by the statute of frauds or by any other principle of law from settling it by an oral agreement, or by an award of arbitrators upon an oral submission of the question to them. It was in this respect like questions arising between adjoining owners of land as to the true location of the dividing line. The award did not enlarge the privilege attached to lot G, nor diminish that appertaining to the easterly side of the river, but defined each. It applied the respective titles of the parties to the property according to its rightful state at the time the titles arose. *Dunklee* v. *Railroad*, 24 N. H. 489. The oral testimony upon which it was found that the Herseys were parties to the submission was competent. *Russell* v. *Allard*, 18 N. H. 222 ; *Furber* v. *Chamberlain*, 29 N. H. 405. The award bound Colby and the Herseys and all persons claiming under them. *Sawyer* v. *Fellows*, 6 N. H. 107 ; *Dudley* v. *Elkins*, 39 N. H. 78 ; *Truesdale* v. *Straw*, 58 N. H. 207, 213 ; *Attorney-General* v. *Taggart*, 66 N. H. 362, 373.

Horne, having succeeded Colby as the owner of the lot, is entitled to the benefit of the award, at least so far as it affects the water rights attached to his lot. As against Horne, the Herseys consequently had, and the defendant — their successor in title to a part of the Hersey land and privilege — now has, the right to draw water through the penstock of 1859, or one like it, "at all times and none other" when the water runs over the wasteway mentioned in the award ; or, stating the proposition in another form, the defendant has no right to make such draft when the water does not run over the wasteway. The award describes the wasteway as the "present wasteway betwixt the present sawmill and gristmills, or . . . a wasteway of the same height and dimensions in case of the destruction of the present mill-dam." Parol testimony was competent to show what that wasteway was ; and the finding of the referee, that it is the one now a part of the dam, identifies it. The defendant's exception to this finding and the testimony upon which it was based must be overruled.

So far as Horne is concerned, the change made in the location and size of the penstock in 1873 is immaterial, provided it is not used so as to infringe upon his right. The water which the owners of that side of the river are entitled to may be drawn through this penstock, in whole or in part, instead of being used at the

sawmill; but when the draft through the penstock and at the saw-mill combined lowers the water in the pond to the level of the wasteway, one or the other of them must cease to the extent of the extra draft above mentioned. Which shall cease depends upon the division that has been made of the water privilege that belonged to the Herseys.

The effect of any draft upon the height of the water in the pond created by the Pickering dam will depend, of course, upon the quantity of water that is flowing into the pond. The latter will depend more or less upon the character and extent of the rights that the owners of the Pickering privilege have to control the flow of water from Smith and Crooked ponds by the dam at the outlet of Crooked pond. Unless in the division of the Pickering privilege the owner of some portion has acquired a special interest in the reservoir right, the right, whatever it may be, would belong equally to every portion of the privilege. In such case each owner would be obliged to exercise the right reasonably, in view of the equal rights of others. Horne would not have the right to draw down the reservoir for the benefit of his privilege without regard to the rights of the owners on the easterly side of the river; neither would the latter be entitled to exhaust the reservoir to the injury of Horne. It has not been suggested that either owner has acquired any special interest in the reservoir right, if any there be, other than such as is a part of the preferential rights created by the division of the Pickering privilege, and it is unnecessary to consider this question further.

Horne, then, is entitled to draw water from the mill-pond to lots F and G through a penstock of the size, location, and capacity of that in existence February 21, 1857, and to have the draft of water by the defendant and owners of the sawmill privilege limited to that which was usually made on that side of the river before the construction of the Hersey penstock, unless the water in the mill-pond is high enough to run over the wasteway. He is also entitled to the benefit of the reservoir right, if any, to the extent above stated.

Prior to October 26, 1872, Hersey, Thompson & Co. became the owners of the land and privilege on the easterly side of the river, owned by the Herseys in 1860. On that date they conveyed the same to Cate, using the following description: "The mills and mill privilege situated in said town of Wolfeborough, bounded and described as follows: [giving the boundaries.] Meaning hereby to convey to said Cate said described lot with the sawmill and box factory, with the machinery and tools belonging to the same." The next year Cate changed the Hersey penstock to a lower level, and considerably increased its size and capacity. January 26,

1876, he conveyed to Hodge and Remick, by metes and bounds, the northerly portion of the land,— the lot on which mill H or the box factory stands,— together with "all the rights and privileges in connection with said property that were conveyed to us [him] by Hersey, Thompson & Co. by their deed dated October 26, 1872, . . . also the right for said grantee to repair the penstock through which the water is conveyed to said box mill." This is the deed that separated the ownership of the box-factory lot and privilege (H) from that of the sawmill lot and privilege (D). The defendant, Hutchins, now owns the former, and the plaintiffs, Berry & Co., the latter. Hutchins has not acquired any additional water rights by prescription, and it is not claimed that he has acquired any in any other way. The nature and extent of his rights were therefore fixed by this deed. He claims that the description, " all the rights and privileges in connection with said property that were conveyed" to Cate by Hersey, Thompson & Co's deed, includes the right to draw water through the present penstock to the extent of its capacity for the use of his mills in preference to all other persons interested in the Pickering privilege, except the owner of the gristmill. It has already appeared that the remainder of the privilege, from which the rights now owned by the defendant were carved by this deed, was then subject to a limitation in favor of rights now owned by the plaintiff Horne. The title to the privilege which Cate obtained from Hersey, Thompson & Co. was subject to this limitation; and the limitation followed the parcels when he conveyed them, and in all subsequent conveyances. It still exists upon the defendant's rights, as has been previously stated.

The defendant's interpretation of the deed ignores or changes the natural and ordinary meaning of the words "all the rights and privileges in connection with said property that were conveyed," etc. "Said property" is the lot described in the deed,— lot H,— not all the land on the easterly side of the river. The sawmill lot was between this lot and the dam, so the latter had no inherent rights in the water privilege created by the dam. The words " in connection with said property " follow and naturally modify the words "all the rights and privileges." A transposition of the former to a position in front of the latter, so that the whole would read, " and, in connection with said property, all the rights and privileges that were conveyed," etc.,— a reading suggested by the defendant,— would express a different idea. There is no authority in the law for such transposition. Presumably, the parties constructed the sentence so that it expressed the idea in mind, giving the words their natural and ordinary meaning as arranged and connected with each other. Moreover, such a transposition would

give the defendant the entire water privilege appertaining to the easterly side of the river, and would destroy the sawmill privilege. The fact that the defendant does not claim the entire privilege is evidence that he is conscious of the error of an interpretation that involves such a transposition of words. "In connection" was evidently used in the sense of "connected." Substituting "lot H" for "said property," and "connected" for "in connection," the description would read, "all the rights and privileges connected with lot H that were conveyed," etc. If the words "that were conveyed," etc., were not in the description, the question would have a different aspect. So far as time is involved in the question, the preceding words would then speak as of the date of the deed. "All rights and privileges in connection with said property" would naturally be all then connected with it. But the words "that were conveyed," etc., were inserted in the deed and cannot be ignored in its construction. Presumably, they perform an office in expressing the grantor's intention. Upon looking at the deed referred to by these words, it is found that the description of the property conveyed by it is very general,—"the mills and mill privilege [describing the land by metes and bounds], meaning hereby to convey . . . said described lot with the sawmill and box factory, with the machinery and tools belonging to the same." There had been a sawmill near the dam for many years, and a box factory on the northerly end of the lot after 1859. Although the land and the water privilege were not divided in ownership, they were separated into two portions in the use that was made of them — one part being used for a sawmill, and the other for a box factory. This division in use had existed for a long time, and must have impressed its characteristics upon the different portions of the property. The penstock as originally constructed by the Herseys delivered certain power to the box factory. By this means certain water rights and privileges were "used in connection" or connected with the box factory. Apparently, those were the rights and privileges which Cate conveyed to Hodge and Remick, and which have passed by mesne conveyances to the defendant.

At the date of Cate's deed to Hodge and Remick, the water was conveyed to the box factory by the penstock which Cate had substituted for the original one in 1873. This penstock was situated at a lower level and had greater capacity than the other one. He granted to Hodge and Remick a right to repair it. Upon a casual consideration of the matter, it might seem that these facts would conflict with the idea expressed by the words of the deed, but further reflection shows that there is no conflict. As the water to be used at the box factory must pass across the sawmill lot, a right to repair the conduit by which it passes, whatever it be, was neces-

sary to enable the owner of the box factory to have the benefit of the power granted with it. The existence of the enlarged and lowered penstock at the date of the deed is the important fact to be considered. It, with the use then actually and usually made of it, would measure the water rights conveyed, if there were no words in the deed expressing a different intention. *Dunklee* v. *Railroad*, 24 N. H. 489. But there are such words. As has been previously shown, the deed conveys, not all rights and privileges connected with lot H at the date of the deed, but all rights and privileges connected with lot H at the date of the Hersey, Thompson & Co. deed. It is inconceivable that Cate would have made this reference to the former deed for a description of the rights conveyed if he intended to convey rights that had become enlarged by intermediate changes in the penstock, and in the extent and manner of the use made of water passing through it, especially as his intention would have been clearly expressed by omitting the words referring to the prior deed. He adopted the physical state of the property at the date of the Hersey, Thompson & Co. deed, and the extent and manner of the use made of the water at that time in connection with the box factory, as the standard for measuring the rights and privilege conveyed by him. If he habitually used more water in the meantime at the box factory, or used water there with an enlarged preference as against the sawmill, these facts would not be inconsistent with his grant; they would simply tend to show that he intended to grant the box factory and the rights formerly appertaining to it, and to retain the ownership of any additional rights he had exercised. For a case very similar to the present one in this respect, see *Perry* v. *Binney*, 103 Mass. 156.

March 24, 1874, nearly two years before his conveyance to Hodge and Remick, Cate conveyed an undivided third part of the lot of land described by metes and bounds, having the sawmill upon it, to Hersey, "reserving the rights to repair the penstock for said mill or box factory, and using the water in said penstock, and for keeping said penstock at the same size and height as it now is." June 6, 1874, he mortgaged the other undivided two thirds to a bank, and the mortgage contained a like reservation. August 3, 1877, he quitclaimed the undivided two thirds to the bank, reserving all rights in favor of the box factory conveyed to Hodge and Remick the year before. By virtue of mesne conveyances, the plaintiffs, Berry & Co., now own this property. The penstock referred to in the deeds is the enlarged one of 1873. The reservations seem to make this penstock the standard for measuring the water rights reserved, and, in this particular, to conflict with the grant of the rights made two years later. It

appears from the referee's report that the Herseys (the former owners of the sawmill and box factory) always conformed to the award of 1860. The referee further reports as follows: "Between the date of the rendition of the award and the time when Luther G. Cate took title [from Hersey, Thompson & Co., October 26, 1872], there is no evidence of any change in the management of the water and the water privileges connected with dam C [the Pickering dam], nor of any change in the appliances used by any of the parties in operating the several privileges, which appear to be material to any issues in this case. The Colbys and their successors always exercised the right of shutting off the water as against all those operating on the easterly side of the river whenever the water was not flowing over the dam — that is, over that part which the referee finds to have been the wasteway, as intended by the terms of the award of the arbitrators. . . . This right was exercised when the water stood in the dam at any height below the line before stated." It is understood from these findings that the old Hersey penstock was used simply to utilize the surplus water of the pond at the box factory. If so, and the use continued until 1876, it would explain the reservations of the deeds of 1874 and the grant of Cate's deed to Hodge and Remick in 1876, and remove the apparent conflict between them. A penstock, however large, conveying only water that was running to waste, would not affect the sawmill privilege or any other privilege at the dam. The enlargement of the penstock in 1873 may have been made to give the box factory the benefit of more of the waste water. Even if Cate, in the deeds of 1874, reserved water rights that were greater than what he conveyed to Hodge and Remick in 1876, the excess seems to have been conveyed to the bank with his two thirds of the sawmill in 1877. However these facts may be, the natural and ordinary meaning of the terms of the Hodge and Remick deed cannot be overcome by anything contained in the deeds of 1874.

To ascertain what the defendant's rights are as against the sawmill privilege, it will be necessary to determine to what extent and in what manner, as to preference or otherwise, water was actually and usually used at the box factory, October 26, 1872, the date of the deed from Hersey, Thompson & Co. to Cate, and prior thereto. *Dunklee* v. *Railroad*, 24 N. H. 489.

Berry & Co. own all that is left of the privilege at the Pickering dam, after the other rights have been satisfied.

*Case discharged.*

All concurred.