Robert W. DRYE et al., Petitioners,

v.

EAGLE ROCK RANCH, INC., et al., Respondents.

No. A–8517.

Supreme Court of Texas.

Nov. 21, 1962.

On Rehearing Jan. 30, 1963.

Sam W. Mintz, DeLange, Hudspeth & Pitman, Houston, for respondent Eagle Rock Ranch, Inc.

John C. Foshee and Arthur P. Bagby, Bagby & Foshee, Austin, for respondent C. B. Smith.

Patterson, McDaniel & Moore, Houston, Mark V. Fuchs, New Braunfels, Edward M. Cape, Terry L. Jacks, San Marcos, Elmer S. Browder, of Patterson, McDaniel & Moore, Houston, for respondents Conso Realty Co., Eagle Rock Corp. and Edward C. James.

GREENHILL, Justice.

Robert Drye and others purchased lots in the subdivisions of the Eagle Rock Ranch area in Wimberley, Hays County, Texas. Several testified that they purchased the lots in the belief that they would have recreation privileges over the entire 1000-acre Eagle Rock Ranch. The deeds to the lots described them by lot and block number with reference to recorded plats of the subdivisions. The major portion of the ranch outside the subdivisions is not shown on the recorded plats. The deeds contain no reference to easements or rights for pleasure and recreation in the 1000 acres of which the subdivisions are a part. There is no contention that there was fraud or mistake in the execution of the deeds, and there was no prayer for reformation of the deeds. The broad questions are whether the lot purchasers got and have such rights for pleasure and recreation in the 1000-acre ranch by private dedication, by implied easements appurtenant, or by estoppel. After a jury trial, the trial court held that the lot owners did acquire such rights. The Austin Court of Civil Appeals reversed, holding that they did not. Tex.Civ.App., 347 S.W.2d 730. This Court granted writ of error to review those holdings.

L. Alvis Vandygriff, Austin, W. T. Barber, San Marcos, O'Quinn, McDaniel & Randle, Austin, Howell Finch, Austin, with above firm, for petitioners.

This is the third round in this litigation. The first appeal is found in James v. Eagle Rock Ranch, Tex.Civ.App., 304 S.W.2d 471. The second involved the question as to

where the case should be tried. In that venue action, the Court of Civil Appeals held that it should be tried in the county where the land was located, Hays County. James v. Drye, Tex.Civ.App., 314 S.W.2d 417. That action was affirmed by this Court. 159 Tex. 321, 320 S.W.2d 319 (1959).

The facts are many and highly complex. They may be gathered more fully from the previous opinions. Because of their great length, only those facts pertinent to our holdings will be set out here. Maps of the areas and subdivisions here in question are set out in the opinion of the Court of Civil Appeals on pages 735–737 of 347 S.W.2d. Reference to them may be helpful in the understanding of this opinion. Those plats, however, were inserted for illustrative purposes and were taken from exhibits prepared for trial. As pertinent here, the plats put of record and referred to in the deeds were separate plats of the 23-, 31-, and 98-acre Ranchito subdivisions and not of the entire ranch.

The basic facts are these: Edward James purchased approximately 1000 acres near Wimberley in 1947. He thereafter transferred or leased the property to various corporations in which he had a controlling interest. In 1949, for purposes of subdividing and selling lots, he conveyed two small tracts (23 and 31 acres) to the Eagle Rock Corporation. These tracts became known as Eagle Rock Ranchitos, Sections 1 and 2. The stock of the Eagle Rock Corporation was owned entirely by the Consolidated Venetian Blind Company, of which Edward James was president and majority stockholder.

Adjacent to Section 1 and near Section 2 was a 19-acre tract which bordered on Cypress Creek. James leased this 19 acres to another corporation, the Eagle Rock Ranch Club. It was a nonprofit organization with no stockholders. The incorporators were James's son, one of James's employees and another person. The tract contained a lodge which had a kitchen, dining area, and rooms for recreation. Also on the 19-acre tract there were placed tennis courts, a pitch-and-putt golf course, a playground, and other recreational facilities. Cypress Creek was dammed at the 19 acres for swimming and fishing. An airplane landing strip was built on another part of the 1000 acres, outside the subdivisions and the 19-acre club tract.

The lease from James to the incorporated club in 1949 provided that the land and the facilities of the club were to be available to the *members of the club* for swimming, tennis, fishing, and other privileges. It included the rights to "the airplane landing field," roads, bridle paths, and other facilities (not located on the 19-acre club tract or in the subdivided tracts). It provided that the lease to the club could be terminated upon certain contingencies including the failure to make a stated profit. And, as will be developed, the lease was terminated later for that reason. At that time, the club members lost the pleasure and recreational privileges they had as club members.

Originally, in 1949, only lot owners could be members of the club, and no one was sold a lot unless he was accepted to membership in the club. Later in 1949, before many of the lot owners purchased their land, the lease was amended to permit others, who were not lot owners, to have the privileges of the club, including those of pleasure and recreation. Thus the rights in the 1000 acres took on characteristics of a license or an easement in gross; i. e., at least as to the non-lot owners, the rights attached to individuals rather than to one or more tracts of land as easements appurtenant to land.

The lease states that the reason for this enlargement of club membership was that "the members of Lessee [club] have not been patronizing the facilities of the Club to a sufficient extent to pay the expenses of operating * * * such Club."

The facilities of the club and the use of the 1000 acres were used as selling devices to promote sales of the lots in the subdivisions. Advertisements were placed in

newspapers and handsome brochures were printed to point out the advantages to be gained by owning a lot in the area and gaining access to the many facilities of the ranch.

As stated, lots were sold only to persons who made application for membership in the club and who were accepted. The application for membership, signed by the lot purchaser, contained this statement:

"This application is made with the distinct understanding that * * * I acquire no interest whatsoever of any kind or character in or to club property * * *."

The members agreed to pay a monthly fee to the club.

The brochure entitled "Bountiful Relaxation" which showed the beauty of the whole ranch and its many facilities stated:

"Eagle Rock Ranch Club is an incorporated club. Members have the usual voting privileges for electing officers and directors. Every Ranchito-owner has one vote * * *.

"While the property outside your own Ranchito is owned by a separate corporation, Eagle Rock Ranch members have an easement over the entire ranch. In other words, *members of the club* have all the pleasure rights over the *entire ranch property*. These rights are legally binding against any owner of the property for 25 years, and are subject to renewal after that time." [Emphasis is ours throughout the opinion.]

The lot owners say that "members" means lot owners and not club members; that the "lot owners" thus get easements for 25 years by these unsigned representations. Taken in context, we think "members" means "club members." The sentence, "In other words, *members of the club*" have certain rights, explains the word "members."

For purposes of this opinion it will be assumed that James in 1950 conveyed the 1000-acre ranch, and the lessor's interest in the club tract, to the Consolidated Venetian Blind Company, a private corporation. Excepted from this conveyance were the two tracts of 23 and 31 acres: the Eagle Rock Ranchitos, Sections 1 and 2.[1] In 1952, the Venetian Blind Company conveyed all its interest to Conso Realty Company, another private corporation of which James was president, manager, and majority stockholder.[2]

Up to this point then, the 23- and 31-acre Ranchito subdivision tracts were owned by Eagle Rock Corporation, and the balance of the 1000 acres by Conso Realty Company. The 19-acre club tract, owned by Conso Realty, was subject to the lease to the Eagle Rock Ranch Club Corporation.

In 1952, a tract to the south of the 1000 acres, the Scudder tract, was acquired by the Eagle Rock Corporation. On it was located a third subdivision, Eagle Rock Ranchitos, Section 3.

The sale of lots in the various subdivisions was begun in 1949. James employed Duncan, a real estate agent, to sell the lots on a commission basis. The plan of lot ownership coupled with the right to use the 1000-acre ranch was advertised in newspapers and by brochures. The idea was conveyed that the purchaser was to get the use of a 1000-acre ranch on which many thousand dollars had been invested. But no one could purchase a lot unless he first joined the Eagle Rock Ranch Club. Interlaced through the advertising and brochures were the benefits to be derived by the "members of the club."

Between 1949 and 1955, approximately 75 lots were sold in the three subdivisions. As will be set out below, C. B. Smith purchased the interests of James et al. in 1955, and other lots were sold between 1955 and the time of suit. It is significant, however,

---

1. The deed from James to the Blind Co. is dated June, 1949, but was not delivered until 1950.

2. The Ide tract of 135 acres, a part of the ranch, was conveyed from James directly to Conso Realty Co. in 1953.

that none of the deeds purported to grant the purchaser any rights or easement over the ranch or over any property outside of the purchaser's own lot. Of approximately 100 lot owners, only 9 are plaintiffs in this suit. They sue on their own behalf and on behalf of "unnamed plaintiffs" similarly situated. They say they represent the class of persons who purchased lots.

In 1955, Eagle Rock Corporation and Conso Realty Company sold all of their interests (the ranch, the unsold lots in the subdivision and the lessor's interest in the Eagle Rock Ranch Club property) to C. B. Smith of Austin for $255,000. Smith transferred the titles to the various properties to a new corporation, Eagle Rock Ranch, Inc. Eagle Rock Ranch, Inc., was a different corporation, with different stockholders, from Eagle Rock Corporation. At the time of trial, then, the land (other than the lots which had been sold) belonged to Eagle Rock Ranch, Inc.

The project was never a profitable undertaking for James or his corporations. Despite the use of the club and its facilities over a six-year period, James testified that the project lost between $400,000 and $500,-000.

In its first year under Smith, the club lost almost $28,000. For the second year, it lost $27,239. Smith informed the club president of his intention to cancel the club's lease. In June of 1956, the lot owners were informed that the lease, under which members had privileges to use the ranch property and the club's facilities, would soon terminate in accordance with the lease provisions giving the lessor the right to cancel in the event profits fell below a prescribed figure. At this time, Smith offered to sell the ranch and club facilities to the club members, most of whom were lot owners; but the members took no action.

In the letter giving notice of the lease's termination, the members were told that club and ranch facilities would nevertheless continue to be available to paid-up members, and that it was expected that "the Eagle Rock Ranch facility" would continue to operate on a public patronage basis. But a year later, on June 1, 1957, with the club continuing to operate at a loss, both the club and the ranch were closed and the gates to them locked.

On June 29, 1957, Robert W. Drye and eight other lot owners brought suit, as individuals and as a class, against C. B. Smith and Eagle Rock Ranch, Inc., for declaratory judgment establishing a 25-year easement for recreation and pleasure across the entire ranch property. The theories of recovery alleged included easements by way of estoppel, dedication, and by implication. Within the ranch area, the lot owners sought, by private dedication and estoppel, to establish as a private park a strip of land between Sections 1 and 2 of the Ranchito Subdivisions.

They also sought damages against James, Conso Realty and Eagle Rock Corporation on the theory that James and the corporations had failed to disclose to Smith and his corporation the basis for the easements which did not appear of record. The Consolidated Venetian Blind Company was never sued or made a party to this suit.

C. B. Smith and Eagle Rock Ranch, Inc., denied any knowledge of any alleged representations made to the lot owners by Duncan, James, or the James corporations. Smith et al. alleged a cross action for damages against James, Conso Realty and Eagle Rock Corporation (but not the Venetian Blind Company). Further in the alternative, they sued James and his corporations for rescission and breach of warranty. They also had a counterclaim against the lot owners to remove cloud on title. James had a counterclaim for damages for conspiracy and slander.

At the end of an eight-week jury trial, judgment was entered against Smith and James and the corporations in their suits, and against the lot owners in their alternative action against James for damages. In accordance with answers to special issues, judgment was entered against Eagle

Rock Ranch, Inc., and for the lot owners in their suit to establish the ranch easements and the park. They obtained a permanent injunction against interference with these rights. Only Eagle Rock Ranch, Inc., and C. B. Smith appealed from the trial court judgment. The lot owners did not appeal from the take nothing judgment against James and his corporations for damages and other relief.

The case for the lot owners was submitted to the jury as a class action. And the rights in the ranch were generally described in the charge to the jury as being to the entire ranch "for pleasure and recreational purposes." For example, the jury was asked: "Do you find * * * that during the period from about June, 1949, to about April, 1955, Edward C. James caused representations to be made to prospective purchaser of lots at the ranch, including one or more of the Plaintiffs, that lot owners [would] have the right to use the ranch for pleasure and recreational purposes?" The jury answered, "Yes."

The general area in question is rural. The purchasers paid more for these lots than is ordinarily paid for rural lots, indicating that they anticipated using the facilities of the ranch. They put improvements (houses which are called ranchitos) of considerable value on the lots. Their deeds to the land, however, made no mention of rights over the ranch by easement or otherwise. The question is whether they acquired legal rights in the ranch property by dedication, implied easement or by estoppel.

### Alter Ego—Disregarding Corporate Entities

■ At the outset, the lot owners are met with the separate ownerships of the properties by various corporations. The deeds to the properties came from the Eagle Rock Corporation, and the lot owners seek easements over land which stood in the name of the Venetian Blind Company and Conso Realty Company, and land leased to the Eagle Rock Ranch Club Corporation. It is elementary that one corporation cannot dedicate land owned by another or grant easements over land not owned by it. Robbins v. Houck, 251 S.W.2d 429 (Tex. Civ.App.1952, writ refused, n.r.e.). If the lot owners cannot pierce the corporate veil, they cannot recover here.

This Court held in Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340 (1955), that:

"Courts will not disregard the corporation fiction and hold individual officers, directors or stockholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations." [284 S.W.2d at 351]

There were no pleadings of fraud, as such, in this case or that the corporations were used as a sham, to justify wrongs, or to avoid personal responsibility. There were no pleadings that the corporations were the alter ego of James. The Venetian Blind Company, in whose name the title to the ranch stood for approximately two years, was not made a party.

We shall, however, for purposes of this opinion assume, without deciding, that the Venetian Blind Company, Conso Realty Company, the Eagle Rock Corporation, and the Eagle Rock Ranch Club Corporation were the same as Edward James; that they were his alter ego. Our decision shall rest, then, upon the rights, or lack of them, which the lot owners got or failed to get, under the statutes and decisions of this State dealing with the conveyance of real property.

### The Statutes of Fraud and of Conveyances

Again at the outset, the lot owners are confronted with the Statute of Frauds and the Statute of Conveyances. The substance

of these statutes, adopted from the English, have been in force since the days of the Republic of Texas. Their interpretation has become an integral and fundamental part of the land law of this State.

The Statute of Conveyances says in part:

"No estate of inheritance or freehold, or for a term of more than one year, in lands and tenements, shall be conveyed from one to another, unless the conveyance be declared by an instrument in writing * * *."[3]

The Statute of Frauds says in part:

"No action shall be brought in any court * * * unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith * * *.

* * * * * *

"4. Upon any contract for the sale of real estate or the lease thereof for a longer term than one year."[4]

■■ The right to go upon the land of another for pleasure and recreation, such as sought here, may be classified either as (1) a license, as a license to picnic or to hunt, or (2) an easement in gross, an interest in land, usually attached to a person but *not* attached or appurtenant to the land of the owner of the right, or (3) an easement appurtenant to the land, a right which *is* attached to the land itself and passing with it. Ordinarily licenses are revocable;

and ordinarily, easements in gross are not transferable or assignable. Alley v. Carleton, 29 Tex. 74 (1867). The lot owners do not claim rights by license or by easements in gross, but claim easements appurtenant. James et al. assert that the rights sought for pleasure and recreation are mere licenses or easements in gross. We shall, however, treat them as easements appurtenant.

■ Treating the alleged rights, then, as easements appurtenant, it has been held by this Court that easements appurtenant are interests in land which require a writing to create or transfer.[5] As urged here, there are some exceptions to the rule: dedication, implied easements appurtenant, and easements by estoppel in pais. These are discussed later herein. But there was no writing here. Therefore, unless the lot owners can bring their case within one of the categories not requiring a writing for the creation of the rights, they cannot prevail.

### Rights by "Private" Dedication

None of the parties to this litigation contends for a public dedication of the land for pleasure and recreational purposes. The plats of the three subdivisions put on record, and which are referred to in the deeds to the lot owners, provide:

"We, Edward C. James [et al.] * * * do hereby make subdivision of said property for and on behalf of said Eagle Rock Corporation * * *. *Said streets and easements are not dedicated to the public* nor intended to be

---

3. Article 1288, Vernon's Texas Civil Statutes Annotated. All references to statutes herein are to the Vernon's Texas Annotated Statutes unless otherwise indicated.

4. Article 3995.

5. City of Aransas Pass v. Minter, Tex. Civ.App., 34 S.W.2d 1113 (1930, writ refused); City of San Antonio v. Grandjean, 91 Tex. 430, 41 S.W. 477, 44 S.W. 476 (1897): "A private easement, as for a private right of way, even at common

law, could only be conveyed by grant; and, besides being an interest in land, it is within the statute of frauds, and must be conveyed in writing." 3 Tiffany, Real Property (3rd ed.), 241, Easements § 776. And see Fritz, "The Texas Law of Conveyancing," Vol. 3, Vernon's Texas Civil Statutes [annotating Art. 1288, the Statute of Conveyances] at p. 6, § 4.

This Court held that even a license, under some conditions, may rise to the dignity of an easement and must be in writing. Parsons v. Hunt, 98 Tex. 420, 84 S.W. 644 at 646 (1905).

or become available for the public for any purpose."

The lot owners contend that the ranch in general, and the area between subdivisions 1 and 2, were dedicated to them, their heirs and assigns. The jury found that there had been a dedication. But the definition of "dedication" in the charge to the jury made no reference to dedication to the public. "Dedication" was defined in substance as "the voluntary setting aside and devotion of property to a particular use or uses." The definition in the charge did not say *to whom* the property was dedicated.

■ That brings us to these questions: May there be a dedication to a limited number of persons? May there be a private dedication? We think the answer, at least as applicable here is, "No." The authorities are uniformly to this effect,[6] and we so hold.

A case bearing some similarity to this is Kraushaar v. Bunny Run Realty Co., 298 Mich. 233, 298 N.W. 514 (1941). There a subdivision was created next to a lake, and it was platted. The plat recited that "drives, roads, boulevards and terraces * * * are hereby dedicated to the use of lot owners of plat * * *." Instead of the roads and beach area being restricted to the use of the lot owners, the subdividers allowed members of the public to use them upon payment of a fee. The lot owners sued on the ground

of dedication to them. The Court held that there was no such thing as dedication to individuals. If there was any dedication, the Court said, it was to the public.[7] See also Burnham v. Davis Islands, Inc., 87 So.2d 97 (Fla.Sup.1956), involving a golf course shown on a plat.

There are two Texas cases which need to be distinguished. The first is Evans v. Southside Place Park Ass'n, 154 S.W.2d 914 (Tex.Civ.App.1941, writ refused for want of merit). The subdividers there created an association to maintain a park in Block 8. The deeds to the lot owners expressly provided that Block 8 "is reserved as a permanent * * * playground for the exclusive use and benefit of the *property owners* of this Addition * * *." The deeds further provided that, "The foregoing terms * * * shall be covenants running with the soil * * *." The question was whether the month-to-month tenants of a lot owner should also be entitled to use the park. It was held that they should not, that the use was reserved to "lot owners," and the tenants were not owners. The opinion then states:

"Nor was there any dedication of the park to the public generally, the clear intendment running through all the deeds, the charter, and the by-laws of the Association, unmistakably being to thereby expressly withhold and negative any such implication, but specifically reserving the entire park Block 8 as 'a

---

6. 4 Tiffany, Real Property (3rd ed.) 333, § 1099: "The purpose and effect of a common-law dedication is to create a right of user in the public, or at least in some particular class of the public, and not in some particular person or persons * * *." "As there cannot be a dedication in favor of a particular person, so there cannot be a dedication in favor of a limited number of persons." Id., at 334.

2 Thompson, Real Property (Perm. ed.) 49, § 483: "Strictly speaking, there is no such thing as the dedication of property to a private use. A private way can not be created by dedication and appropriation for the use of particular persons only." To the same effect are 26 C.J.S.

Dedication §, 8, p. 408, and 16 Am.Jur. 349, Dedication, § 5. Wolf v. Brass, 72 Tex. 133, 12 S.W. 159, at 160 (1888): "Technically speaking, a dedication can be made to public uses only * * *."

There are cases which uphold dedications to particular groups for cemetery purposes or for religious purposes. Tiffany suggests that these are not properly "dedications," but that the title passes by grant. 4 Tiffany, Real Property (3rd ed.) 334 and 335, § 1099.

7. The question as to whether the streets located on the plats in the Eagle Rock Ranch area were dedicated to the public is not before us and we express no opinion thereon.

permanent park and playground, for the exclusive use and benefit of the property owners'."

By refusing the application for writ of error in that case "for want of merit," this Court approved the result reached. The Court of Civil Appeals did not hold that there had been a private dedication. It held that there had not been a public dedication. The basis for the holding was that each lot owner, by express writing in his deed, obtained a covenant running with the land that Block 8 would be reserved as a park for the lot owners.

Another case to be distinguished is Hogue v. Glover, 302 S.W.2d 757 (Tex.Civ.App. 1957, writ refused, n. r. e.). The subdivision there centered around "Lake Helen," a lake formed by a concrete dam across a creek within the City of Dallas. The plat of the subdivision designated the area of Block B as "Lake Helen." Each lot purchaser was told that he would receive a share of stock in a corporation, the Beckley Boating & Fishing Club, Inc. Then the subdivider conveyed the area, Block B, to the corporation. A few years later the dam broke, and the "lake" again became part of the creek bed. The charter of the corporation was forfeited. Thereafter, a group of people, purporting to represent the defunct corporation, attempted to convey Block B to Fagg who conveyed it to Hogue. The suit was by the lot owners to enjoin Hogue from erecting a house on "Lake Helen." The City of Dallas intervened. The injunction was granted. The Court of Civil Appeals affirmed, giving several reasons, at least two of which were sound and would account for this Court's refusal of the writ, "No Reversible Error." First, the area was not suitable for residential purposes under the zoning ordinance of the City of Dallas because it was a creek bed. Second, there was no showing that those who purported to represent the defunct corporation and who deeded the property to Fagg, who conveyed to Hogue, had any authority to do so.

The City, in the Hogue case, contended that Block B had been dedicated to the public by designating the area as "Lake Helen" on the plat. The City further claimed the area by virtue of its being within the bed of a stream. The Court held that there had not been a dedication to the public. It did not hold that there had been a private dedication; and the briefs in this Court in that case made no such contention. The Court of Civil Appeals, relying on the Southside Place Park case, discussed just above, held that the "so-called dedication [of Block B] was * * * a covenant running with the land * * * for the use and benefit of such home owners * * *." We need not comment on the correctness of this statement, since the case was correctly decided on other grounds. In any event, the case is not authority for the proposition that there was a private dedication to the lot owners.

We hold that the lot owners here acquired no rights by private dedication in the 1000-acre ranch or in the area between Subdivisions 1 and 2.

### Implied Easements Appurtenant to the Land: Easements for Pleasure and Recreation

There were no easements granted in the deeds to the lot owners. As another exception to the statutes set out above, easements are sometimes necessarily implied. Those will be here considered.

Before considering whether easements for recreation and pleasure will be *implied* into the deeds by the court, it will be helpful to review briefly the course of acceptable easements appurtenant expressly granted in writing, with particular reference to easements for pleasure and recreation.

At common law, it was considered that a written easement to wander about over the land of another was invalid. It was referred to as a "jus spatiandi," which was a contraction of a part of a Latin phrase (taken from the Roman law), which when translated was: "A praedial servitude can-

not be created so as to give me permission to pick an apple, to wander about or to picnic on another's land." [8] Only as late as 1955, the English Court of Appeals upheld a written easement in a park, a relatively small square, surrounded on three sides by homeowners and on the fourth side by the sea. The deed to the lot owners contained the written easements to use the park, subject to a fee for upkeep. It was held that the area *was* subject to easements appurtenant to the lot owners, the *jus spatiandi* notwithstanding. The park was likened to a garden which traditionally (as an appurtenance) adjoined to a residence. The area and all its uses were well defined. In re Ellenborough Park, 3 All E.R. 667 (1955).

Thus, in England it was stated that easements, even in writing, were traditionally limited to six categories: air, light, ways or roads, support, water, and fences.[9] Probably because of this restricted view, the legislatures in several states, including California, Montana, Oklahoma, North Dakota and South Dakota, enacted statutes to permit servitudes or easements for rights of pasture, fishing, hunting, conducting lawful sports, and similar purposes.[10] Texas has no similar statute. Apparently the policy of those jurisdictions limiting easements appurtenant was that the land should be left free for development and not burdened with uses which were less important to the economic development of the community.

This Court does not take the view that the types of permissible easements have been, or are, limited to the prescribed few listed above. Assuming that this Court will uphold express written easements appurtenant to land for pleasure and recreational purposes, this historical development influences our thinking on whether such easements will be implied by the courts under circumstances such as are here presented in the absence of a written agreement or deed of the parties. It is stated in 17A Am.Jur. 653, § 41, that:

"Such doctrine of implied easements extends no further than to servitudes of a permanent nature well known or plainly apparent * * * evidently necessary to the convenient enjoyment of the property to which they belong *and not for the purpose of pleasure.*" [11]

8. "Jus Spatiandi,—a Valid Easement, re Ellenborough Park," 2 Sidney Law Review (1956–58) 370; "Re Ellenborough Park," 3 All England Law Reports Annotated (1955) 667; "The Right to Use a Private Pleasure Ground," 221 The Law Times (1956) 34.

9. Behan, Covenants Affecting Land (1924) 45; and see Alfred Conard, "Easement Novelties." 30 California Law Review (1942) 125, at 126.

10. 1 Thompson, Real Property (Perm. ed.) 523, Easements, § 327.

11. This section of American Jurisprudence was cited as authority in this Court's opinion in Ulbricht v. Friedsam, 159 Tex. 607, 325 S.W.2d 669 (1959). The lot owners do not here rely on Ulbricht v. Friedsam, but a word should be said about it. Simplifying the facts, Friedsam owned land on Lake Buchanan. He granted the LCRA an easement to overflow it below 1020-foot elevation but reserved the right to use the land to the water's edge. This right was expressly referred to as a "covenant running with the land." Ulbricht purchased the upland part of the land from Friedsam. The metes and bounds description, in part, called for the 1020-foot contour line. The main question was whether this line was a boundary or a meander line. It was held to be a boundary line. The question was then over Ulbricht's right to get to the water, which was below the 1020-foot line. The deed to Ulbricht did not expressly convey an easement, but the grantor did not reserve the "covenant running with the land," mentioned in the LCRA lease. It was pointed out in the Ulbricht opinion that in another suit in which no appeal was taken, Ulbricht obtained a judgment giving him easement rights to the use [the water and shores] of Lake Buchanan "as a means of ingress and egress" to his land.

The evidence also showed that the land purchased by Ulbricht had been continuously used to pasture livestock. There was no water on the uplands. The Court took judicial notice of the need of cattle for water. The Court held that the parties to the deed necessarily intended that

A similar statement as to easements appurtenant by implication is found in Thompson: "That the right or privilege is merely convenient is not sufficient, but it must be necessary and essential to the proper enjoyment of the estate granted, and not for the purpose of mere pleasure." 1 Thompson, Real Property (Perm. ed.) 643, § 394.

■ For there to be an easement appurtenant, either expressed in writing or implied, there must be a dominant estate and a servient estate. The easement attaches to the land of the dominant estate and not merely for the convenience of the owner thereof independent of the use of his land. The servient estate is subject to the use of the dominant estate to the extent of the easement granted or reserved. It generally takes the form of a negative easement: the owner of the servient estate simply may not interfere with the right of the owner of the dominant estate to use the servient estate for the purpose of the easement. Pokorny v. Yudin, 188 S.W.2d 185 (Tex.Civ.App.1945, no writ). This concept is in contrast to an easement in gross which attaches to an individual and is not dependent upon the existence of a dominant estate in land. Alley v. Carleton, 29 Tex. 74 (1867).

■ If an owner used one part of his land for the benefit of another portion of his own land, the portion served had a "quasi-dominant tenement." The portion which was used was subject to a "quasi-servient tenement." The doctrine of implied easement appurtenant developed when the owner, under those circumstances, sold the portion of his land which had had the use of the other portion—as for drainage, support, way, or water. If use of the "servient" tract was apparent, continuous, and necessary to the use of the "dominant" land sold, the courts presumed that the necessary use of the "servient" tract passed by implication to the purchaser.[12] The law read into the instrument that which both grantor and grantee must have intended had they both given the obvious facts of the transaction proper consideration. Mitchell v. Castellaw, 151 Tex. 56, 246 S.W.2d 163, at 167 (1952).

■ For several reasons, including the Statutes of Frauds and Conveyances and the recording statutes, the courts have been careful in the engrafting of easements by implication. The requirements have become fairly standardized.[13] They may be summarized as follows:

1. The use must be *apparent*, in existence at the time of the grant (as the quasi-servient tenement mentioned above). For example, a road into or out of the granted area, a stairway to a second-story dwelling, a party wall, a drain or aqueduct.

---

the rights to get to the water should pass to Ulbricht, and the Court implied the grant of the easement appurtenant. The lands adjacent to Ulbricht's had been subdivided, and the lot owners continuously and openly used the water for boating and recreation. Having in mind the previous *judgment* giving Ulbricht the easement on the waterfront, the necessarily implied easement for water for the livestock, the open and continuous use of the lake by owners of adjacent land, the Court held that the rights reserved by Friedsam in the LCRA grant (the "covenant running with the land" to use the waterfront) passed by implication to Ulbricht in Friedsam's deed to Ulbricht. As one of the authorities for this, the Court cited 17A Am.Jur. 653, Easements, § 41. That section sets out circumstances under which easements appurtenant may be implied, but concludes by saying, "and not for purposes of pleasure." It is not necessary to decide, and we do not hold here, that an easement for recreation could not be implied under any circumstances. It is held that they may not be implied here.

12. 3 Tiffany, Real Property (3rd ed.) 255, § 781.

13. 3 Tiffany, Real Property (3rd ed.) 257, § 782 et seq.; 1 Thompson, Real Property (Perm. ed.) 543, § 337 et seq.; 28 C.J.S. Easements § 33, p. 691 (which adds a requirement that the use be "permanent"); 17A Am.Jur. 652, Easements, § 41.

2. Its use must have been *continuous*— so that the parties must have intended that its use pass by the grant. In some instances the view is taken that the use is "continuous" if no further act of man is necessary to its continuous exercise; i. e., neither the grantor nor anyone for him will have to perform any act in order that the grantee may obtain the benefit of the alleged easement. Included within the concept of "continuous" is that degree of conspicuousness and apparentness that indicates permanency.

3. Its use must be *necessary* to the use of the dominant estate. For example: a water or sewer line into the granted estate; a drain from the land; a way to and from the estate granted; light and air; lateral support; and, it has been held in many instances, water. Ulbricht v. Friedsam, supra, Footnote 11. The degree of "necessity" will be discussed later herein. In the great majority of the cases in which easements have been implied, the necessity has been economic or physical necessity for the use of the land rather than some merely desirable right for the occupant of the land.

The Texas authorities are in accord. In Howell v. Estes, 71 Tex. 690, 12 S.W. 62 (1888), Howell owned two adjoining business lots on which were two buildings with a common wall. The stairway for both was in one of the buildings. The plaintiff acquired from Howell one of the buildings, the one without a stairway. The defendant, who acquired the other building, denied the plaintiff and his tenants the use of the stair. It was held that the use of the stair on defendant's property had passed by necessary implication as an easement appurtenant to plaintiff's building. Reviewing the authorities on the qualities necessary for an implied easement appurtenant, the Court found these essential: that the use be apparent, open, permanent in character, and continuous. "A 'discontinuous' easement is said to be one which requires the act of man to complete it." And it must be necessary to the use of the dominant estate. Though the plaintiff, at some expense, could have built an outside stairway, and to this extent the stair in the servient building was not strictly necessary, sufficient necessity was shown to support the easement.[14]

The degree of "necessity" required was deliberately reviewed by this Court in Mitchell v. Castellaw, 151 Tex. 56, 246 S.W.2d 163 (1952). The greater portion of that opinion dealt with an implied reservation of an easement rather than an implied grant. A stricter rule applies to an implied reservation. The Court there weighed the requirement of "reasonably necessary" to the use of the dominant estate against "strict necessity." In adopting the "strict necessity" requirement as to implied reservations this Court said: " * * * the whole theory of implied easements is somewhat in derogation of the registration statutes and indeed the Statute of Frauds * * *." The Court reasoned that "strict necessity" would be easier to apply. As to implied grants, the Court said, " * * * even in the case of an implied grant, courts do not lightly hold the grantor to convey more than stated in his deed * * *."

One other problem is presented here. It may be treated as part of the requirement of "apparentness" set out above. For the easement appurtenant to be implied, some degree of definiteness in the scope or extent of the interest is essential to its recognition as an interest in land or a property interest. The Restatement of Property gives an example of definiteness and indefiniteness:

"An example of a privilege of the first sort [definite] is the right of way and sewer lines into the dominant tract. The general rules are also set out in Ulbricht v. Friedsam, 159 Tex. 607, 325 S.W.2d 669, at 676 (1959).

14. Howell v. Estes, above, was followed in Pokorny v. Yudin, 188 S.W.2d 185 (Tex. Civ.App.1945, no writ), where easements appurtenant were implied for water, gas

with prescribed boundaries, of the second [indefinite], the privilege of strolling at pleasure through a field * * *. When a use has not the degree of definiteness necessary to the creation of an easement, the privilege to make it can be nothing more than a license." 5 Restatement, Property 2910, § 450.

■ Easements for pleasure and recreation over a 1000-acre ranch including the right to study nature, picnic, hike, ride horseback, camp out, bird watch and other similar activities fall within the general category of "novelty easements." They present problems even when they are created in writing.[15] Supervision and enforcement by a court of an implied easement of this nature are difficult.

■ We now apply these principles of this case. There had been no continuous, apparent, obvious, or permanent use of a portion of the ranch for the necessary use of another portion thereof. There existed no quasi-servient or dominant estates at the time of the sales. Nor was there a definiteness or certainty in the servitudes sought to be established on the servient estate. This fact is particularly impressive in view of the historic reluctance of the common law courts to recognize easements to wander about land and to use it for pleasure and recreational purposes even when there were written grants. It is our view that for these reasons, we may not imply easements appurtenant in favor of the lots in the subdivision over the 1000-acre ranch. It is therefore unnecessary to decide whether the doctrine of "strict necessity" for an implied reservation, applied by this Court in Mitchell v. Castellaw, 151 Tex. 56, 246 S.W.2d 163 (1952), applies also to implied grants of easements appurtenant. We therefore hold that the lot owners did not acquire

easements appurtenant over the ranch by implication in their deeds.

### Estoppel in Pais

One other exception to the statutes requiring a writing is the doctrine of estoppel in pais. The owner of land, under some circumstances, may be estopped to deny the existence of an easement by making representations which have been acted upon by a purchaser to his detriment.

While the Court of Civil Appeals held there was no evidence of authority to make the representations by the person who made them, there is testimony that representations were made to purchasers that they would have "the run of the ranch"; that the easements would exist on the entire ranch; and that one or more of the purchasers understood that these rights came with the land and were not dependent (entirely) on membership in the club.

The exact nature and extent of the doctrine of estoppel in pais have not been clearly defined. It has been applied in some definite categories of suits involving land. Outside of these particular groups, however, the authority for its application is rare and nebulous.

■ Most frequently the doctrine has been referred to in those cases arising out of dedication of a street, alley, or square. It is the *dedication* to the public which gives the rights in streets, parks, and similar areas the degree of certainty and permanency. But estoppel in pais is not dependent upon a dedication and may arise and exist independent of it. Harrison v. Boring, 44 Tex. 255, at 266 (1875); Wolf v. Brass, 72 Tex. 133, 12 S.W. 159 (1888); 3 Tiffany, Real Property (3rd ed.), 312 et seq., Easements, § 800. The areas of land involved in these cases, however, are generally well defined as are the servitudes sought to be imposed on them.

15. Alfred F. Conard, "An Analysis of Licenses in Land," 42 Columbia Law Review 809 (1942); by the same author,

"Easement Novelties," 30 California Law Review 125 (1942).

The doctrine has also been used or referred to in opinions dealing with situations in which the owner sells land with reference to a map or plat upon which are shown and designated streets, alleys, squares and similar areas. It has been held that when a purchaser, relying upon such representations, buys with reference thereto and spends money to make improvements, the seller will not be heard to say that such easements do not exist. Oswald v. Grenet, 22 Tex. 94 (1858); Harrison v. Boring, 44 Tex. 255 (1875); Lamar County v. Clements, 49 Tex. 347 (1878). These cases involved a single lot or block of city land. In other cases, the land purchased is described in the deed as bounded by a street or way, and the grantor is estopped to deny the existence of the street or way. Because of the failure of the courts clearly to explain the true nature of estoppel in pais, Tiffany suggests that many of these cases would be based more properly on a construction of the grant in the light of the surrounding circumstances and upon the doctrine of implied easements, discussed above. 3 Tiffany, Real Property (3rd ed.), 315, § 800, Easements; and see 3 Powell, Real Property (1952), 413, § 409, Easements.

The doctrine of estoppel in pais has been applied when the seller allows the purchaser to expend money on the "servient" tract, as for example a drainage ditch across the grantor's land, or a house or other structure which encroaches on the land of the "servient" estate. The lot owners here made no improvements on the "servient" estate. While estoppel cases are not limited to situations involving this type of expenditure, this group does form a large part of the cases affixing easements appurtenant by estoppel. The doctrine has also been applied in some instances to restrictions in subdivisions as to the type of structure to be built and its location on the land. 5 Powell, Real Property (1956), 148 et seq., § 672. In commenting on these cases involving equitable servitudes and promises concerning the use of land, Powell says

that the extension of this doctrine "has caused some judicial hesitance. Some courts have refused such an extension * * *. Other courts swallow the 'promissory estoppel' without a gulp * * *." 5 Powell, Real Property (1956), 151, § 672.

While the above does not purport to list all of the situations, pertinent here, in which estoppel in pais has been applied to real estate to circumvent the Statutes of Frauds and of Conveyances, it does illustrate the rather narrow band of cases in which the doctrine has been applied. We find no Texas authority for an extension of the doctrine to the broad facts here shown. Such authority as exists outside of Texas greatly preponderates against its extension.

The case most strongly urged by the lot owners is McCleary v. Lourie, 80 N.H. 389, 117 A. 730 (1922). The case is discussed at length in the dissent hereto. It is clearly distinguishable because the plat of the subdivision was placed of record, and each deed recited that the lot thereby conveyed was a part of such plat or plan as duly recorded, thereby incorporating the plat or part of the grant to satisfy the Statute of Frauds. There is no corresponding plat of the 1000-acre ranch here or any reference in any deed to any such plat. The only plats of record were separate plats of the particular Subdivisions 1, 2, and 3. As we construe the plats of Eagle Rock Ranchitos 2 and 3, there is no corresponding area over which we could imply an easement by construction of the recorded plat or the individual deeds. The plat of Subdivision 1 is of "31.0 acres," and this would include only the lots and streets. There is shown on that plat the 19-acre club tract with areas marked as "golf course," "playground," etc. But the lot owners requested no issue as to this 19-acre tract. They treated it as part of the whole 1000 acres over which they sought easements for pleasure and recreation. And they have no point of error in this Court on this 19-acre club tract.

■ Our conclusion, therefore, is that the authorities do not support an easement by estoppel in pais for pleasure and recreation to such an area as is involved here. We have further concluded that we should not extend the authorities. Our reasons follow.

There are some preliminary considerations. Thompson states the rule to be that it is essential to the creation of estoppel that the representation be "communicated to him" [the promisee], that it be believed, and relied upon. 5 Thompson, Real Property (3rd ed.), 406 and 426, §§ 2616 and 2626. Here, nine plaintiffs sue as individuals and purport to represent other unnamed plaintiffs and the class of [all] lot owners. The jury found that representations were made to "one or more of the plaintiffs." The evidence shows a variety of representations and reactions thereto. No issue was submitted to the jury on estoppel as to any individual. The respondents argue that the basis of estoppel is a personal matter: representations to, and proof of reliance by, the individual. We shall assume, without deciding, however, that this is a proper suit for a class action.

The evidence, as pointed out above, was that brochures exhibited to purchasers said that *"members of the club"* have all the pleasure rights over the entire ranch property"; that lot owners also became club members; and that the application for membership, signed by the lot owners, said, "This application is made with the distinct understanding that * * * I acquire no interest whatsoever of any kind or character in or to the club property * * *." Respondents therefore contend that there is, therefore, no basis for estoppel. We shall assume, however, that other representations were made "to one or more of the plaintiffs" sufficient to satisfy this feature of the case.

The easement sought by estoppel is an easement appurtenant. Yet the rights sought have many of the characteristics of an easement in gross; i. e., privileges over the ranch which could be and were enjoyed by persons other than lot owners; privileges which were personally enjoyable but not necessary for the use of the purchased lots. Membership in the club was available to persons other than lot owners. As said in the Restatement under Promises Respecting the Use of Land, "For a promise to run with the land of the promisor it is not enough that the performance of the promise operates to benefit either the promisor or the beneficiary of the promise in the use of the land but it must operate to benefit him in the physical use of the land." 5 Restatement, Property, 3220, § 537, Servitudes (1944).

The main difficulties, however, with the lot owners' case is the nature and extent of the "easements" claimed, their indefiniteness, and enforcement of the rights claimed to have been obtained. As indicated above, easements "for pleasure and recreation" create grave problems even when expressly granted in writing. To say the least, they were not favored at common law. First, rights to go upon land to hike, camp out, study nature and the like were classed as licenses and not interests in land. Licenses to hunt and fish are common even today. This is not to say that such an "easement" or interest in land could not be created. But the authorities for the imposition by the courts of an easement appurtenant to land for such purposes are meager.

The privileges sought here as an easement appurtenant to land by estoppel are indefinite. The "run of the ranch," 1000 acres of land, contains no description of rights. Rights "for pleasure and recreation" over such an area is likewise indefinite. Some degree of definiteness in the scope or extent of an interest is essential to its recognition as a property interest. As set out above, the Restatement illustrates the point in this way: a right of way over a prescribed area is definite, but "the privilege of strolling at pleasure through a field" is too indefinite. 5 Restatement, Property, 2910, § 450 Servitudes (1944).

**212**

And see Conard, "Easement Novelties," 30 Calif.L.Rev., 125 at 138 (1942).

A by-product of the indefiniteness of easements for recreation and pleasure, not contained in a writing, is the problem of their enforcement. If the court is to decree the easements, it must fix their terms and be in a position to see that they are enforced. Doing this for all of the various forms of "recreation and pleasure" over 1000 acres of land for years to come would be difficult indeed.

 If the airstrip, golf course, and the like are to retain their usefulness, they must be kept in repair. This problem relates to one of the requirements for the implication of an easement: that nothing be required of the grantor to perpetuate the easement. The easement which is implied is a negative one: that the grantor simply not interfere. In McCleary v. Lourie, 80 N.H. 389, 117 A. 730, discussed above and in the dissent hereto, no act was required of the grantor except to allow people to walk through a designated grove to the lake. Much more difficult problems are presented here.

While it is not a controlling question here, the question as to who is to pay taxes on this 1000-acre area indefinitely is a consideration.

 The alternative to the land's being kept in repair is that it simply be left vacant and unkept for the use of lot owners. There is a rather strong public policy in favor of land use rather than non-use. The policy is also in favor of the free alienation of property, particularly as the title to the property is reflected on the public records. Viewing the problem from the State as a whole, to impose indefinite servitudes for pleasure and recreation on so large an area would tend to fetter estates, retard building and improvements thereon, and hinder the use of the land. 5 Powell, Real Property (1956), 153, § 673; Conard, "An Analysis of Licenses in Land," 42 Columbia Law Review, 809, at 826 to conclusion (1942); 17-A American Jurisprudence, 646–647, § 37, Easements; 5 Restatement Property, 3179, Servitudes, § 526. As to the policy on alienability of land and unencumbered land titles, see 5 Restatement, Property, 3160.

Again, this is not to say that parties could not make a definite agreement in writing for the use of land for pleasure and recreation. No such question is before us. But we do hold that under the facts presented here, the authorities do not support the fixing of easements by estoppel in pais, and we are unwilling to extend the doctrine to the extent necessary to affix them here. In an appropriate case, a purchaser may have relief by reformation of his deed or in a suit for damages. The lot owners here do not seek reformation; and except as to an alternative suit for damages against James, discussed below, they did not bring a suit for damages.

### Alternative Action for Damages against James

The lot owners had an alternative cause of action for damages against James for "breach of contractual duty." The breach referred to is James's failure to inform his grantee, Smith, that the lot owners had easements by estoppel over the ranch. The theory was that in the event their equitable rights of easement by estoppel were cut off by the purchase of legal title by Smith,[16] they could then recover damages against James for his failure to give notice to Smith, the subsequent owner of the ranch. Of course, this action is not directed at rights allegedly created by dedication or to easements created by implication since these rights, if they had existed, would have passed with the land. They would not have been equitable in nature or subject to being cut off by a bona fide purchaser of legal title.

16. See Callan v. Walters, 190 S.W. 829, at 831 (Tex.Civ.App.1916, no writ).

■ The jury findings were against the lot owners on their theory of James's non-disclosure. The jury found that Smith bought *with notice* "that one or more plaintiffs claimed the rights to use the ranch for pleasure and recreation purposes." The special issues on damages were conditioned on a finding that Smith had no notice. The jury did not answer those issues. In short, the jury finding destroyed an essential element in the damages theory, and the trial court entered a take-nothing judgment against the lot owners as to damages. The lot owners took no appeal from this adverse judgment. Whether their failure to do so constituted waiver of their cause of action for damages, or whether the trial court's judgment simply became final thereon are questions which need not be discussed here. In either event, the lot owners cannot now recover on that cause of action.

The judgment of the Court of Civil Appeals is affirmed.

SMITH, J., dissenting.

SMITH, Justice.

I respectfully dissent. The area of disagreement is primarily narrowed to challenging the Court's holdings:

(1) That the doctrine of equitable estoppel does not apply; and

(2) That the lot owners can not recover because such owners have failed to establish rights in the 1000-acre ranch. The basis for this holding being that the lot owners have failed to bring their case within one of the exceptions to the rules requiring a writing for the creation of rights in land. In other words, the Court is saying that the lot owners are barred from a recovery by the statutes of frauds and of conveyances.

The Court assumes that this is a proper subject for a class action, but argues against said assumption, whereas, this dissent not only assumes it to be, but points out why it is a proper subject for such action.

This suit was properly brought as a class action by representative lot owners. Drye and eight other lot owners brought this suit to establish and declare their rights to use the Eagle Rock Ranch (1000 acres) for pleasure and recreational purposes. Their rights to such use arose out of the activities of James, the former owner, which he is estopped to deny and which acts were also tantamount to a private dedication of the ranch and the park area for such purposes. James represented to Drye et al. at the time of their purchase of lots that such rights accrued to each lot owner. Implicit in such dedication and representation was the concept that the right to so use the ranch would be common to all lot owners. Each purchaser of a lot was promised more than the right to ride, fish, swim, and picnic alone and in solitude. He was promised, in effect, that all other lot owners would have the same right so that each could share and enjoy the company of any or all of his neighbors at Eagle Rock Ranch. Joint participation in the recreational use of the ranch by all residents of Eagle Rock was of the essence of the plan offered to each prospective lot owner.

Drye et al. thus sued not only to establish their several individual rights to the use of the ranch, but also to establish a right, as represented to them, that the use of the ranch would be common to all lot owners. The position of Drye et al. is simply this: That when James made the agreement with the initial lot purchaser or purchasers that the use of the ranch would be common to all lot owners, then Drye et al. had the right to not only establish their several individual rights to the use of the ranch, but also to establish a right, as represented to them, that the use of the ranch would be common to all lot owners. I agree with Drye et al. The rights run to each lot owner. *The very nature of each lot owner's position is that other lot owners derive through him a right to use the land for recreational purposes.* By this one suit a multitude of common questions are settled for the class, and the character of the rights was established

in the trial court as being common to all lot owners as a class. These common rights became irrevocable when the owner made his first sale pursuant to representations of that character relied on by the first purchaser. Therefore, allegation, proof and jury findings respecting one person who bought on promises of common rights for all amounts to specific proof and findings as to every member of the entire class. Naturally, the class are those whose rights became irrevocable upon the sale to various persons relying on the easement representations, and whose rights arise out of the principles of estoppel inherent in any type of dedication.

I would reject respondent's contention that each lot owner has a separate and distinct cause of action which cannot be joined with the causes of action of other lot owners to establish the easements by estoppel or by dedication. Respondent would require proof that each lot purchaser individually relied on the easement or on the "dedication." In making such contention, they fail to recognize that the common rights of all lot owners were fixed when the owner made his first sale pursuant to representations of that character relied on by the first purchaser. For authorities supporting the position that this suit was properly brought as a class action see: Rule 42, Texas Rules of Civil Procedure; Southern Ornamental Iron Works v. Morrow, Tex. Civ.App., 101 S.W.2d 336 (Ft. Wth., 1937, err. ref.); Gray et al. v. Moore, Tex.Civ. App., 172 S.W.2d 746 (Amarillo, 1943, err. ref., w. m.); Richardson et al. v. Kelly, 144 Tex. 497, 191 S.W.2d 857; Smith v. Swormstedt (1853), 16 How. 288, 57 U.S. 288, 14 L.Ed. 942, (often cited by the Texas courts); Charles et al. v. Crestview Properties, Inc. et al., 15 Pa.Dist. & Co.R.2d 568, 71 Dauph.Co.R. 172 (Penn., 1957); Allen v. Thousand Island Park Corporation, 18 Misc.2d 1079, 186 N.Y.S.2d 861 (1959); Mills v. Carolina Cemetery Park Corp., 242 N.C. 20, 86 S.E.2d 893 (1955); Sheets v. Thomann, 336 S.W.2d 701 (Full Edition), (Mo.Ct. of App., 1960); Greer v. Smith, 155 App.Div. 420, 140 N.Y.S. 43 (1913);

City of Birmingham v. Fairview Home Owners Association et al., 259 Ala. 500, 66 So.2d 775 (1953); Kelly v. Tiner, 91 S.C. 41, 74 S.E. 30 (1912); Conner v. Heaton et al., 205 Ark. 269, 168 S.W.2d 399 (Full Ed.) (1943); Weeks et al. v. Bareco Oil Company et al., 125 F.2d 84 (7th Cir., 1941); Fanucchi v. Coberly-West Co., 151 Cal.App. 2d 72, 311 P.2d 33 (1957).

This leads us into a consideration of the question of whether equitable estoppel applies. I take the position that it does. Intent of the owner of the servient estate is immaterial on an easement by estoppel but is material on an easement by dedication. In either event, the result is the same as to the purchase of the dominant estate. Easements by estoppel and by dedication in the present case arise for pleasure and recreational purposes exactly in the same manner as easements by estoppel and by dedication for any other purpose, such as for streets (private or public), parks, or any other uses designated as being for the benefit of purchasers. See Wolf v. Brass, 72 Tex. 133, 12 S.W. 159. To this writer, the Wolf case is actually saying that a dedication ordinarily involves *public usage,* but that regardless of terminology, individual lot owners acquire easement rights by acts on the part of the owner and that this result occurs when the first lot is sold and thereafter runs in favor of all who purchase in the same subdivision.

Equitable estoppel should certainly apply in the present case.

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is precluded, both in law and equity, from asserting rights of property, contract or remedy against one who has in good faith relied upon his conduct, and by reason thereof has acquired some corresponding right of property or remedy." Simpkins on Equity, 2nd Ed. 1911, at p. 669. Simpkins went on to say that equitable estoppel " * * * gives triumph to right and justice when nothing else known to our jurisprudence can secure those ends."

The word "dedicate" in the present case was given a precise definition in the court's charge to the jury. Since neither the definition nor the special issues mentioned the public in any way, there could have been no confusion in the minds of the jury about what the definition meant. Where a subdivider of land indicates on a map, *or by other unequivocal* acts *or declarations* that certain land is to be applied to a particular use for the benefit of the lot owners, it is immaterial what label is applied to the owners' acts. See Lamar County v. Clements, 49 Tex. 347. In the Lamar County case, the Court expressly recognized that "dedication" may be to others than the public when it said that "where a dedication is clearly manifested by unequivocal acts or declarations, upon which the public, *or those interested in* such dedications, have acted, the owner's intention is immaterial." Emphasis added.

The dedication in the present case operates by way of an estoppel. The respondents, under the record in this case, are estopped by the act of James and his agents to deny that an easement over the 1000 acres exists for pleasure and recreational purposes. In the case of City of San Antonio v. Sullivan, 23 Tex.Civ.App. 619, 57 S.W. 42, 44, (1900), wr. ref., the Court said, "[T]he sale of lots in accordance with a map vests in the purchasers the right to use the streets appearing upon such map, and the right so vested cannot be defeated by the act of the vendor, because by the sale, under such circumstances, he is estopped to deny or impeach rights thus acquired." The analogy to the present case is apparent. Regardless of whether a subdivision map shows lots and streets or the subdivision map shows only the lots and no streets, if the subdivider or owner points out a street (here bridle paths, roads, etc.) then open on the ground adjoining the subdivision and represents that it is a street, he being either the owner of the area occupied by the street or his authorized agent, this effectually constitutes a dedication which is accepted when a person relies upon the representations, whether shown on the map or on the ground, and purchases a lot bought with reference to such street.

Since a dedication need not be in writing, and an easement need not be public, it certainly follows that a dedication can be made by oral representation and that the oral representation can be made to something less than the public or specifically, to all prospective purchasers of lots in a given development. It seems to me that the case of San Antonio v. Grandjean, 91 Tex. 430, 41 S.W. 477, 44 S.W. 476, recognized that private rights may arise even though there has been no public acceptance. The Court said:

"It is generally said that the dedication operates by way of estoppel. In many cases the law of estoppel applies without doubt. A grantor, by conveying to his grantee a lot in a town or city, and in the description calling for a street, upon which it is asserted to abut, may estop himself to deny, as against his grantee, that such a street exists, although the town or city may never accept it as such."

Article 974a, Vernon's Annotated Civil Statutes, while not being involved here since Eagle Rock Ranch is not in an incorporated city or within five miles of one, is persuasive authority for showing that there can be a dedication for a limited group of persons. Section 1 of the Article, in describing what must be shown on a plat, states that the owner among other things must show thereon "all streets, alleys, squares, parks or other portions of same intended to be dedicated to public use, or for the use of purchasers or owners of lots fronting thereon or adjacent thereto." However, be that as it may, respondents are in no position to assert the statutes of frauds and conveyances. This applies not only to James, but to all of the respondents as they had notice of the easements and therefore were bound the same irrevocable status of the rights of Drye et al. and those of the same class.

The cases relied upon by the Court of Civil Appeals and this court have no application here. From the very nature of estoppel and dedication, none of the statutes or rules considered in those cases can or should be applied to the present case. See Handal v. Cobo, Tex.Civ.App., 225 S.W. 67, wr. ref.; Newman v. Nellis, 97 N.Y. 285, 289.

The cardinal principle for disregarding the statutes of frauds and of conveyances, the oral evidence and merger rules in estoppel and dedication cases is that to do so would perpetrate a fraud. See Callahan v. Walsh, Tex.Civ.App., 49 S.W.2d 945, wr. ref.; Halsell et al. v. Scurr, Tex.Civ. App., 297 S.W. 524, (1927), wr. dis'm., w. o. j.; Texas Co. v. Burkett, 117 Tex. 16, 296 S.W. 273, 54 A.L.R. 1397.

Thus far I have been dealing with easements by estoppel and by dedication. There is still another reason, however, why the lot owners should recover. In this case, Drye et al. rights were also pleaded to be appurtenant easements. The evidence, in my judgment, fully suports this form of easements. The Court here assumes, without deciding, that the Venetian Blind Company, Conso Realty Company, the Eagle Rock Ranch Club Corporation were the same as Edward James. Therefore, I do not go into the mass of evidence which conclusively shows that such corporations were his alter ego. I cannot, however, agree with the Court where it says that our "decision shall rest, then, upon the rights, or lack of them, which the lot owners got or failed to get, under the statutes and decisions of this state dealing with the conveyance of real property."

Besides being easements by estoppel and by dedication, the rights contended for by the lot owners passed as appurtenances by the grant with the deeds to the ranchitos for the reason that the road to the creek, the area along the creek, the creek itself, the club area, and the ranch area beyond were shown to prospective purchasers as being for their use, were being used upon the ground at the time by other ranchito owners, and were reasonably necessary upon the purchase of a ranchito for the enjoyment of the property conveyed. The record is undisputed that numerous roads leading out of the subdivisions and into the ranch were open, usable, apparent, and reasonably necessary for the enjoyment of the ranchitos. None of the roads shown on the recorded map of Section 2 was a dead-end road on the ground. There are roads leading out of both Sections 1 and 2. The several plain and usable roads laid out within Section 2 for instance are not dead-end roads, but they are continuous as they lead on the ground into and out of Section 2 and onto and over various portions of the ranch. Any reasonable stranger, much less the respondents here, all with a unity of interest, would be charged with notice, and either upon inquiry or observation of the ground, would readily learn and would be readily lead to believe that this system of existing roads out of the subdivisions and over the ranch was part of the total setup and available for use by those who bought lots. Therefore, in addition to considering that the entire ranch was represented orally and in writing to be open and available for the exercise of easement rights by property owners, there were visible roads, well traveled, during all of the periods pertinent here. Any reasonable person interested in purchasing a lot or the 1000-acre ranch would conclude that the lot owners did not make valuable improvement on the lots in the form of houses, stables, etc., believing that they only had the right to enter the ranch and go to their own ranchitos and thereafter their activities be confined to moving about over the streets in the subdivisions. Since the roads leading out of the subdivisions and onto the ranch were well traveled and in use during all pertinent times, they are appurtenant easements, if not ways by implication or of necessity, to get from the public road and from the subdivisions to all parts of the ranch. Likewise, the ranch areas reached by these roads would be appurtenances.

In view of the fact showing that there was a unity of interest between James and his Corporations whereby each acted for the other without distinction, it is all the more evident that open and visible roads leading out of the subdivisions and into the ranch areas to which they led, would pass with the deed to each lot as part of the grant as appurtenances. The 1000-acre ranch from the date of sale of the first lot and continuously thereafter has been burdened with an easement in favor of the lot owners, and any sale of the ranch property passes the title subject to such existing easements. This is not in any sense an easement to be enjoyed by the general public. In fact, these lot owners would have the legal right to enjoin the use of the ranch by the general public. According to the record, there was never any intention that the public should have the right to enjoy the property. The ranch was not dedicated for public use.

The case of McCleary v. Lourie, from the Supreme Court of New Hampshire, reported in 117 A., at p. 730, so thoroughly supports my position on the question of estoppel and easements appurtenant, and the facts are so nearly the same that I have concluded to quote the opinion in full:

"SNOW, J. There being no specific grant to the plaintiffs of an easement in the grove, nor express covenant with respect to its use, the plaintiffs' interest therein, if any, under the facts in this case, must be established by way of estoppel.

"[1] Mrs. Thayer, plaintiffs' grantor, caused the Point to be surveyed and plotted pursuant to a purpose to develop White Birch Point as an exclusive summer colony. It is clear, from the character of such an enterprise and the location and situation of the property, as disclosed by the survey and plan, that the lake was regarded as an essential feature of the proposed development. It was the grantor's apparent purpose to utilize this feature by means of the grove adjoining the beach, which connected the water front with the system of proposed roads. The advantages of the lake, beach, and grove were accordingly stressed in elaborate advertising matter and proclaimed to patrons as inducements to the purchase of lots. Prospective purchasers were shown the plan and given to understand that the grove and beach were to be kept open for their use. The master has found that these areas were convenient and beneficial to the purchasers, that the representations were made with the intention that they should be acted upon and that they operated as inducements to the several purchasers. Having thus induced the plaintiffs to purchase lots enhanced in value by rights in the grove and beach, the grantor and those claiming under her with knowledge are estopped to deny the existence of those rights. Walker v. Manchester, 58 N.H. 438, 441; Douglass v. Belknap Springs Land, 76 N.H. 254, 256, 81 Atl. 1086, 37 L.R.A. (N.S.) 953.

"[2] The practical construction of the grants by the immediate parties thereto was of such a character as to put any one dealing with the property upon inquiry as to the authority under which the grantees were claiming to exercise rights of control and passage over the grove. The plaintiffs, from the dates of their several deeds, used the grove and beach as common recreation ground. Both grove and beach were in daily and extensive use for the seasonable period of each year. This use left obvious marks upon the ground, in the form of several paths leading from Lake Road across the grove to the lake. In 1912 an association of cottage owners was formed, which from time to time helped to clear up and make improvements upon the grove and beach, and contributed to the construction of a stone pier extending into the lake and of a float moored adjoining the beach. It is difficult to conceive how such

indicia of control and dominion could have escaped the attention of one seeking to purchase.

"[3] Each deed in defendant's chain of title contained a specific reference to the Hutchinson plan. The plan thus became an essential part of each conveyance, and put the purchaser upon inquiry as to all facts which would have been disclosed by an examination of the property in the light of the plan. Inquiry would have elicited information as to the existence and extent of the rights which were being openly and continuously exercised. Under such circumstances, it must be presumed that the several owners in the defendants' chain of title had knowledge of the rightful use which was being made of the property. Property conveyed passes subject to all existing easements and burdens in favor of other lands which are apparent from the situation and the customary use of the property. Dunklee v. Wilton R. Co., 24 N.H. 489, 495, 496; Horne v. Hutchins, 71 N.H. 128, 136, 51 Atl. 651.

"[4] The acceptance by the cottagers of unusual privileges in the grove by special permission of the proprietor, such as the privilege of holding picnics, did not forfeit or diminish their rightful interest in the easements therein nor excuse a prospective purchaser of the grove from making inquires as to the extent and limitations of such easements. Notices published or posted by the proprietor, forbidding the use of the beach, but which were designed to prevent depredations and to keep out trouble makers, and did not come to the attention of the cottagers, nor affect the customary enjoyment of their easements, are immaterial. The error of the defendants' immediate grantor in supposing that the beneficiaries of the easement were confined to patrons of the inn did not excuse his failure to inquire; nor did the recital in his deed to the defendants of his understanding

that there were no deeded rights of way over the grove to the lake enlarge the rights conveyed, as against the plaintiffs.

"[5, 6] The defendants, before taking title, examined the Hutchinson plan, and knew it was recorded. They knew of the use of the grove and beach by the cottagers, looked the property over thoroughly, saw the boat landing and float, and the paths leading to them, but sought no explanation of the obvious dominion by the cottagers over the property of which they were contemplating the purchase. The fact that their proposed use of the property as a site for a girls' camp depended upon the exclusive use of the beach and grove does not help them, but only renders less excusable their failure to seek an explanation of its open use and occupation by others. It cannot be assumed that inquiries would have failed to elicit the truth. The finding of the master that the defendants were chargeable with knowledge of the use to which the grove had been put, and were at fault for not making further investigations, seems to be abundantly sustained by the subsidiary findings of fact. They did not escape the effects of their knowledge by reliance upon the report of their attorney as to the record title; nor were their rights enlarged by the unauthorized admission of the president of the association that it had no legal rights in the grove.

"[7] The ruling of the master that, to constitute a common-law dedication, the property must be set apart for the public generally is sustained by the authorities, 18 Corpus Juris, 46, 50. It is a significant fact that no member of the public, as distinct from the cottage and lot owners who have an easement in the locus in quo, appears to be here claiming any rights. The subsidiary finding of fact of the exclusive character of the enterprise sufficiently sustains the ultimate finding as to the limited

·character of the appropriation. The limitation of the use of the facilities to the members of the summer colony was presumably one of the inducements to the purchase of lots by them. The main purpose of the promoter and of her patrons would have been thwarted, if the public generally were to be admitted as a matter of right of equal use and enjoyment with them of the grove and beach."

The trial Court's judgment was correct in the establishment of easements, therefore, under my view, the alternative action for damages by Drye et al. is not reached.

The judgment of the Court of Civil Appeals should be reversed and that of the trial court affirmed.

## ON MOTION FOR REHEARING

GREENHILL, Justice.

In their reply to the application for writ of error, Respondent Eagle Rock Ranch, Inc., stated that "Respondent [Eagle Rock Ranch, Inc.], its officers and agents, have no desire or intention to interfere with petitioners' free access to, from and within the recorded subdivisions * * * and have never asserted any right to do so." They included within this "the strip described in paragraph J" which is a way between subdivisions one and three of Eagle Rock Ranchitos subdivisions. They further state that this is so without regard to whether or not this is a severable portion of the judgment of the trial court. Since these rights were conceded by Respondent, we did not include them in our original opinion. On rehearing, however, petitioners urge that these matters be included in our opinion and judgment. Again on rehearing respondents repeat their position: they assure the Court that they will not interfere with petitioners' free access "to and within the recorded subdivisions."

The deeds to the lot owners described the lots conveyed according to map or plat of the subdivision. The deed recites the book and page in the deed records where such plat is recorded. The plat shows the streets as well as the lots and blocks. The plat recites in part that "the streets and easements shown on said map are for the sole and exclusive use of said Eagle Rock Corporation and the owners of the lots. * * *" The plat is signed and duly acknowledged by Edward W. James and L. L. Gordon, president and secretary of Eagle Rock Corporation, the owner of the property.

In our original opinion, we reserved the question as to whether this constituted a dedication to the public because none of the parties so contended. But its expressed intent is to grant to the lot owners the use of the streets.

Our original opinion stated that there were no easements granted in the deeds to the lot owners. By that we meant that there were no easements expressly given in the deeds, and this is so. We then discussed easements which were alleged to have been raised by implication and dealt with such alleged easements to the ranch outside of the subdivisions.

Since the deeds refer to the recorded plats, and since the plats specifically state that lot owners shall have the use of the streets, the right to use the streets was impliedly granted in the deeds themselves. Moreover, the streets in the subdivisions meet the other requisites for an easement by implication as set out in our original opinion: they were apparent, continuous, and necessary for the physical use of petitioners' land. City of Corsicana v. Zorn, 97 Tex. 317, 78 S.W.2d 924 (1904).

In view of the above, and in view of the position which Respondent Eagle Rock Ranch, Inc., has consistently taken in this Court, we hold that the lot owners shall have full use of the said streets and access to and from the said subdivisions by roads which connect such steets with pubic roads. We further hold that the access between

Subdivisions 1 and 3 at the northeast corner of Subdivision 3, joining Presidio Road and LaToya Trail to each other and to the county road shall remain open to the said lot owners.

To the extent of the holding set out above, the motion for rehearing is granted; and the take-nothing judgment of the Court of Civil Appeals heretofore affirmed is modified to the extent herein indicated, and as thus modified is affirmed. In other respects, the motion for rehearing is overruled.