# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00027-CV

**Craig Nickels and Sheila Nickels, Appellants**

**v.**

**James Casburg; James W. Casburg, Sr.; Joe F. McNair; Charles Anderson; Daniel W. Casburg; Mamie L. Hollan; Vernon L. Crane; Kent A. Schooler; Kerin J. Schooler; Marvin Moring; Richard G. Washington; Eileen Washington; Richard Naber; Madelyn Naber; Graciela Pena; Ayron Brooks; Robert W. Ruggiero; Sally B. Ruggiero; David Mathews; Freda Mathews; David Mathews II; Linda McNair; Fred Nelson; Marie Claymore; Flat Creek Limited; Kent Alden Schooler and Kerin Jo Schooler, Trustees of Schooler Living Trust; Patricia Sue Maloney; Rory A. McLaughlin; Sallie McLaughlin; Robert W. Ruggiero, Individually and as authorized agent of the Texas Veterans Land Board; George Ruggiero, Individually and as authorized agent of the Texas Veterans Land Board; and Tina Broderick, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. GN300526, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal concerns the existence and scope of an easement to use a lakeside tract on Lake Travis as a recreation and private park area. Craig and Sheila Nickels, the owners of the lakeside tract and other land in the subdivision Travis Peak Estates, appeal the district court's judgment in favor of appellees who are property owners and residents in the subdivision.[1] The

---

[1] Craig and Sheila Nickels brought suit initially against James Casburg; James W. Casburg, Sr.; Joe F. McNair; Charles Anderson; Daniel W. and Tammy R. Casburg; Mamie L. Hollan; Vernon L. Crane; Kent A. and Kerin Schooler; Marvin and Carol Ivey Moring; Richard G. and Eileen Washington; Richard and Madelyn Naber; Graciela Pena; Paula and Aaron Neujahr; Ayron Brooks;

district court declared that appellees have an easement to use the lakeside tract as a recreation and private park area and granted appellees' requests for injunctive relief and attorney's fees. For the reasons that follow, we affirm the district court's judgment.

## BACKGROUND

*Creation of Travis Peak Estates*

In 1962, P&W Co. acquired a 2,052.75-acre tract of land on the north shore of Lake Travis in Travis County that was part of the Joshua English Survey No. 2 to create the Travis Peak Estates subdivision. James Watson, one of the principals of P&W Co., prepared but did not record a subdivision plat for Travis Peak Estates in 1962, subdividing the 2,052.75-acre tract. The subdivision plat shows the location and configuration of tracts and roads, including a 50-foot roadway easement ("Roadway Easement") and the four-acre lakeside tract in dispute (the "Lakeside Tract"). On the subdivision plat, the Roadway Easement ends at the entrance to the Lakeside Tract, and the Lakeside Tract is identified as "EASEMENT AREA FOR USE OF TRAVIS PEAK ESTATES OWNERS."[2] P&W Co. cleared the Lakeside Tract and constructed a road along the Roadway Easement and a concrete boat ramp within the Lakeside Tract. P&W Co. recorded a

---

Robert W. and Sally B. Ruggiero; David and Freda Mathews; and David Mathews II. Linda McNair; Fred Nelson; Marie Claymore; Flat Creek Limited; Kent Alden Schooler and Kerin Jo Schooler, Trustees of Schooler Living Trust; Patricia Sue Maloney; Rory A. McLaughlin; Sallie McLaughlin; Robert W. Ruggiero and George Ruggiero, individually and as authorized agents of the Texas Veterans Land Board; and Tina Broderick intervened in the action. Appellees have informed this Court that Carol Moring died during the pendency of the suit and her estate passed to her husband, Marvin Moring, and that Tammy R. Casburg, Paula Neujahr, and Aaron Neujahr were dismissed from the suit before the final judgment.

[2] The subdivision plat also reflects that the Roadway Easement is "FOR USE OF TRAVIS PEAK ESTATES OWNERS."

2

description of the Roadway Easement and the Lakeside Tract—identified as the "easement area"—by metes and bounds in January1963 at Volume 2566, Page 225, of the Travis County Deed Records.

From 1963 to 1971, P&W Co. marketed and sold the tracts in Travis Peak Estates, executing 21 deeds to original purchasers.[3] P&W Co. provided prospective purchasers with a copy of the subdivision plat that identified the Lakeside Tract as the "easement area" for use by property owners of Travis Peak Estates. Many of the tracts did not have access to Lake Travis without the Lakeside Tract. The property owners in Travis Peak Estates had access to and used the Lakeside Tract without interruption from the 1960s until the present dispute. Their use included a 917 square foot area ("917-SF area") that is adjacent to the Lakeside Tract and located on a separate tract of land that the Nickelses purchased. The property owners' uses of the 917-SF area included using it as a "turnaround" area in conjunction with launching boats from the boat ramp.

***The Controversy***

Craig and Sheila Nickels purchased two adjacent tracts of property in Travis Peak Estates—a 60.003-acre tract and a 10.279-acre tract—that were part of the last tract in Travis Peak Estates conveyed by P&W Co. in January 1971 to an original purchaser. The 10.279-acre tract includes the Lakeside Tract and a segment of the Roadway Easement leading to the Lakeside Tract. The Nickelses purchased the 60.003-acre tract from Westlake, I.G., on June 19, 1997. On the same day, the Nickelses, Westlake, and Peninsula Investments, LLC, an entity related to Westlake, I.G.,

---

[3] At the time of trial, the original tracts that P&W Co. sold had been further subdivided.

entered into a "Reciprocal Easement, Conveyance and Escrow Agreement."[4] The parties agreed that Peninsula would convey the 10.279-acre tract to the Nickelses in exchange for the Nickelses conveying an easement on the 60.003-acre tract.

The general warranty deed for the 60.003-acre tract describes the tract conveyed as "60.003 acres of land, more or less, out of the Joshua English Survey No. 2, in Travis County." The warranty deed also references the document that P&W Co. recorded in 1963 at Volume 2566, Page 225 of the Travis County Deed Records and excepts from the Nickelses' title the rights of the property owners in Travis Peak Estates to use the "easement area":

> Subject to the rights of the Owners in Travis Peak Estates for the use of the easement area described on the plat contained within the instrument recorded in Volume 3978, Page 1401, Deed Records of Travis County, Texas.

The Nickelses' title policy to the 60.003-acre tract similarly subjects the Nickelses' title "to the rights of the Owners in Travis Peak Estates for the use of the easement area described on the plat contained within the instrument recorded in Volume 3978, Page 1401, Deed Records of Travis County." The instrument recorded in Volume 3978, Page 1401, was an option contract that had attached to it a plat drawing depicting the Lakeside Tract as the "EASEMENT AREA FOR USE OF TRAVIS PEAK ESTATES OWNERS."[5]

---

[4] Mr. Nickels testified at trial that the same principals were involved in Westlake and Peninsula.

[5] The copy of the drawing is not entirely legible, but the Nickelses do not dispute that the drawing contains a description of the Lakeside Tract as the "EASEMENT AREA FOR USE OF TRAVIS PEAK ESTATES OWNERS."

The title policy covered the 60.003-acre tract as "Tract 1" and the "easement" estate as "Tract 2":

> TRACT 2: EASEMENT ESTATE created by that certain instrument dated January 3, 1963, between JAMES T. WATSON, REGISTERED PUBLIC SURVEYOR NO. 290, and the RECORD OWNERS, recorded in Volume 2566, Page 225, Deed Records of Travis County, Texas, and as granted in Volume 3380, Page 542, and Volume 4431, Page 1523, Deed Records of Travis County, Texas.

The Nickelses' purchase contract for the 60.003-acre tract also had attached to it a drawing showing the Lakeside Tract identified as the "easement area" with a "conc. ramp" adjacent to their 60.003-acre tract.

Several months later, the Nickelses completed their purchase of the 10.279-acre tract from Peninsula in exchange for granting Peninsula a temporary private access easement across the 60.003-acre tract for the benefit of other property Peninsula retained. The Nickelses did not pay cash consideration and did not obtain a title policy on the 10.279-acre tract. The general warranty deed conveying the 10.279-acre tract identifies the property being conveyed:

> Property (including any improvements): 10.279 acres, more or less, out of the Joshua English Survey No. 2, Travis County, Texas as more particularly described by metes and bounds in Exhibit "A" attached hereto and incorporated by reference.

"Exhibit A" is "field notes" prepared in May 1997 by Watson Surveying,[6] that describe the property conveyed:

---

[6] Stuart Watson, the son of James Watson, prepared and signed this document. The two Watsons worked together in their business Watson Surveying. We refer to James Watson as "Watson" or "James Watson."

> Field Notes for 10.279 acres out of the Joshua English Survey No. 2, Travis County, Texas, being part of a 386.4 acre tract . . . , also being part of that unrecorded subdivision plat by James T. Watson, registered professional land surveyor No. 290, surveyed in December of 1962 and titled "Travis Peak Estates," said 10.279 acres being composed of a 50′ road easement and adjacent easement area as recorded in Volume 2566, Page 225, and Volume 3240, Page 1165 . . . .

The document includes the address and telephone number for Watson Surveying.

After the Nickelses purchased their properties and built a home on the 60.003-acre tract, disputes arose between the Nickelses and various property owners in Travis Peak Estates, including the property owners' right to use the Lakeside Tract. In 2002, the Nickelses locked the entry gate into the Lakeside Tract.

### *Litigation Commenced*

The dispute between the parties continued, culminating in the Nickelses bringing this suit in 2003. The Nickelses sought a declaration as to the parties' respective rights to use the "easement area." The Nickelses also sought injunctive relief and monetary damages from certain individual appellees for trespass, nuisance, intentional infliction of emotional distress, assault, battery, threat of bodily injury, and civil conspiracy.[7] In their counterclaims, appellees sought declaratory relief regarding their use of the "easement area" under the legal theories of easement by express grant, implied easement, easement by prescription, and easement by estoppel. They also sought injunctive relief and attorney's fees. During the pendency of the suit, the district court

---

[7] During the pendency of the suit, the Nickelses obtained a temporary injunction against appellee David Mathews II. The district court ultimately denied the Nickelses' claims for monetary damages, and the Nickelses do not challenge the denial of these claims on appeal.

enjoined the Nickelses from interfering with appellees' use of the "easement area," and the Nickelses fenced off the 917-SF area located on the 60.003-acre tract.

The trial was to the bench. The Nickelses' witnesses included Mr. Nickels, Mrs. Nickels, and Jim Erdeljac, the Nickelses' real estate broker on the 60.003-acre tract. The Nickelses testified to the circumstances surrounding their purchase of the two tracts, visits to the property prior to their purchase, their understanding and investigation of the rights of Travis Peak Estates property owners to use the "easement area," and their confrontations with Travis Peak Estates property owners after their purchase.[8] They testified that they had a copy of a map or drawing depicting the Roadway Easement and the "easement area" with a "concrete ramp" prior to closing on their properties, and that they "had noticed" the "depiction of the easement area and the concrete ramp." They also testified that they obtained title to the 10.279-acre tract without clarification of the property owners' rights to use the "easement area" and without title insurance, they did not visit the Lakeside Tract until after they completed the purchase of the 60.003-acre tract, they pay "nominal" property taxes on the 10.279-acre tract, and they did not pay monetary consideration for the 10.279-acre tract.[9]

---

[8] Mr. Nickels testified first, and Mrs. Nickels adopted his testimony as her own.

[9] Mr. Nickels testified that "Peninsula principals" proposed to "swap ten acres for the 30-foot easement" and that there were not any additional negotiations as to the terms beyond the location of the easement on the 60.003-acre tract:

Q. Okay. But in any event, there wasn't any give and take between Westlake, beyond their first offer to you, which was to trade the fee simple for the easement?

A. None. I mean we talked about where we were going to put the easement.

7

Mr. Nickels testified to the Nickelses' reasons for purchasing the 10.279-acre tract:

Q.  Given what you've told me about what you knew when you closed on your 60-acre property and what you didn't know, am I to understand that you were giving—you and your wife were giving a 30-foot easement [to Peninsula] across your 60-acre property in exchange for a deed to property that had an encumbrance, if you will, an easement, for these Travis Peak Estates owners who you didn't know what that was or who they were and didn't know and didn't care. You were willing to make that trade in the blind, so to speak?

A.  It solved our access problem to the 60 acres.

                              * * *

Q.  Okay. Well, are—by that are you saying that you didn't really care about the easement area, what you cared about was the 50-foot roadway easement on the east side of your property so that you could get into your property?

A.  When we were—the whole trade was set up to get us access to the 60 acres.

                              * * *

Q.  And the easement area down at the cove that's in dispute here, was not necessary for access to your property, was it?

A.  No, it was not.

Q.  So is it accurate that that was just an add-on, if you will, that really was not part of your thinking of the—of what you were trading there?

During cross-examination, Mr. Nickels testified further:

Q.  [The Lakeside Tract] looks nice to me. It looks very inviting. Did you—did the thought ever go through your mind, why would someone give this up?

A.  Why would they? No.

Q.  For no money. No money changed hands. Did it ever—did a warning light ever go off for you, why am I getting this for no money?

A.  No.

8

A.    It was presented to us as here's what we will offer for the 30-foot easement.
      It wasn't this par[cel] and that par[cel].  It was just—

Q.    Okay.  Well, you were willing to give this easement across your property and
      receive title to the 50-foot roadway easement along the east side of your
      property and title to the four-and-a-half acre easement tract.  And as far as the
      four-and-a-half easement—four-and-a-half acre easement tract was
      concerned, you didn't know and you didn't care who had the right to go down
      there; is that accurate?

A.    We had asked a lot of people.  Nobody seemed to care.  So I assumed that
      there was not much too worry about it, that's correct.[10]

Erdeljac testified to his visits to the properties with the Nickelses before they purchased the

properties, and to his conversations with the Nickelses concerning the "easement area" but that he

was not involved in the Nickelses' negotiation and purchase of the 10.279-acre tract.

        Appellees' witnesses included present and past property owners in Travis Peak

Estates; family members of property owners; James Watson, the sole surviving principal of P&W

Co.; Stuart Watson; and George Sanders, a surveyor who prepared a metes and bounds description

of the 917-SF area in 2004.  Property owners testified consistently to their respective purchases of

property in Travis Peak Estates and their understanding that they had the right to use the Roadway

Easement and the "easement area" as a recreation and private park area when they purchased their

properties; improvements that they made to their properties; their use, maintenance, and repairs of

---

[10] A recital in the Reciprocal Easement, Conveyance, and Escrow Agreement was consistent
with Mr. Nickels's testimony as to the reasons for agreeing to the 10.279-acre transaction:

    WHEREAS, Nickels wishes to secure title to a fifty foot (50′) portion of a certain
    tract of land adjacent to the Nickels Property owned by Peninsula (the "Peninsula
    Property") which would provide Nickels with access to Lake Travis, and Peninsula
    wishes to secure an easement for ingress and egress along and through the Nickels
    Property.

the Roadway Easement, the "easement area," and the 917-SF area; their use of the 917-SF area as a "turnaround" area in conjunction with the boat ramp; and to confrontations with the Nickelses.

James Watson testified that: (i) P&W Co. intended for the "easement area" to be a recreation and private park for property owners in Travis Peak Estates; (ii) he made representations to that effect to prospective purchasers; (iii) P&W Co. provided marketing materials to prospective purchasers including the subdivision plat of Travis Peak Estates; (iv) he performed survey work on Travis Peak Estates and he testified to the scope of that work; and (v) P&W Co. constructed the road and boat ramp and cleared the "easement area" prior to selling tracts in the subdivision.[11]

Exhibits at trial included the deeds from P&W Co. to original purchasers, as well as subsequent deeds in appellees' respective chains of title, differing versions of the subdivision plat of Travis Peak Estates, the document that Watson prepared and recorded in 1963 describing by metes and bounds the Roadway Easement and the "easement area," and the document prepared by Sanders in 2004 describing by metes and bounds the 917-SF area. At the conclusion of the evidence, appellees stipulated that they were not seeking "fee simple" but a prescriptive easement to the 917-SF area.

The district court entered judgment in favor of appellees, declaring that "Travis Peak Estates Property Owners[12] (and their invited family members, guests and invitees accompanied by

_____

[11] Watson testified that there was "quite a bit of bulldozing work to do in that cove [the 'easement area']. It was a pretty steep type cove. And it was bulldozed so that a boat ramp could be built there."

[12] The final judgment defines the "Travis Peak Estates Property Owners" to mean:

the following defendants and intervenors owning property in Travis Peak Estates: Defendants and Intervenors James Casburg; Joe F. McNair; Charles Anderson;

10

a Travis Peak Estates Property Owner), tenants, successors and assigns" have "an easement to use the Easement Area as a recreation and private park area," setting forth "permitted activities" and declaring:

> The Travis Peak Estates Property Owners (and their invited family members, guests and invitees accompanied by a Travis Peak Estates Property Owner), tenants, successors and assigns shall be permitted free access to the Easement Area at all times.

The district court defined the "Easement Area" to mean the "land described as Easement Area on the James T. Watson Field Notes recorded in Volume 2566, Page 225, Travis County Real Property Records, together with that certain additional area comprising 917 square feet, more or less, described more particularly on Exhibit 'A' attached hereto and incorporated herein by reference for all purposes." Exhibit "A" is the document that Sanders prepared in 2004 describing the 917-SF area by metes and bounds. The district court also enjoined the Nickelses from interfering with appellees' permitted uses of the "Easement Area" as defined by the district court and the Roadway Easement and awarded appellees attorney's fees and costs.[13]

---

Daniel W. Casburg; Mamie L. Hollan; Vernon L. Crane; Marvin Moring; Carol Moring; Richard G. Washington; Eileen Washington; Ayron Brooks; and Robert W. Ruggiero; and Intervenors Linda McNair; Fred Nelson; Marie Claymore; Flat Creek Limited, owned by Richard Naber and Madelyn Naber; Kent Alden Schooler and Kerin Jo Schooler, Trustees and beneficiaries of the Schooler Living Trust; Patricia Sue Maloney; Rory A. McLaughlin; Sallie McLaughlin; and Robert W. Ruggiero, Individually and as authorized agent of the Texas Veterans Land Board; George Ruggiero, Individually and as authorized agent of the Texas Veterans Land Board; Tina Broderick; and Freda Annette Dufour f/k/a Freda Dufour Mathews (also known as Freda Annette Mathews).

[13] On appeal, the Nickelses do not challenge appellees' right to use the Roadway Easement.

11

The district court entered findings of fact and conclusions of law. In its findings of fact, it defined the "Easement Area" separately from the 917-SF area.[14] The district court's findings of fact included:

1.     Beginning in approximately 1962, P&W Co. as owner subdivided the tract comprising 2,052.75 acres, more or less, which was located in Travis County on Lake Travis, into tracts and lots and then marketed the lots and tracts to the public pursuant to a common scheme or plan of development for the subdivision known as Travis Peak Estates.

2.     In connection with and in furtherance of the marketing and sale of the lots and tracts in Travis Peak Estates, surveyor James T. Watson, on behalf of the developer P&W Co. and as one of its principals, prepared a map or plat of the subdivision ("P&W Map"), which showed the location and configuration of the lots and tracts in the Travis Peak Estates subdivision, the location of the roads that would provide ingress, egress, and access to the lots and tracts in Travis Peak Estates, including the portion of the road easement referred to herein as the Roadway Easement (which is the portion located on land owned by Plaintiffs Craig and Sheila Nickels), and the location and configuration of the Easement Area comprising approximately four acres located on Lake Travis, which was described on the P&W Map as follows: "EASEMENT AREA FOR USE OF TRAVIS PEAK ESTATES OWNERS."

3.     In connection with and in furtherance of the marketing and sale of the lots and tracts in Travis Peak Estates, surveyor James T. Watson, on behalf of the developer P&W Co. and as one of its principals, also prepared a metes and bounds description of the Roadway Easement and a metes and bounds description of the Easement Area that was recorded in the Deed Records of Travis County, in Volume 2566, at page 225.

4.     In 1962 or 1963, P&W Co. in furtherance of the marketing and sale of lots and tracts in Travis Peak Estates, P&W Co. constructed the roads in Travis Peak Estates including along the Roadway Easement leading to the Easement

_____

[14] The district court defined the "Easement Area" differently in the final judgment and in its findings of fact and conclusions of law. In its findings of fact and conclusions of law, the district court defined the "Easement Area" to mean only "that tract of land described as Easement Area on the James T. Watson field notes recorded in Volume 2566, Page 225."

12

Area, and on the Easement Area, P&W Co. constructed a concrete boat ramp, which is still in place, for use by owners of property in Travis Peak Estates.

5. P&W Co. gave the P&W Map to actual and prospective purchasers of property in Travis Peak Estates in connection with the marketing and sale of lots and tracts in Travis Peak Estates.

6. P&W Co. set aside and reserved the Easement Area for the use of the Travis Peak Estates Property Owners as a recreation and private park area.

7. Representatives of P&W Co. made representations, both oral and otherwise, to purchasers of tracts in Travis Peak Estates that the tracts would be and were sold with easement rights to use the Easement Area and the Easement Area was set aside and reserved for use by owners of property in Travis Peak Estates as a recreation and private park area.

8. Most of the tracts and lots in Travis Peak Estates do not have frontage on Lake Travis, and reserving and setting aside the Easement Area, which is located on Lake Travis, for the use of owners of property in Travis Peak Estates as a recreation and private park area, was an important and valuable amenity and benefit to purchasers included within their purchase.

9. Travis Peak Estates Property Owners are owners of property in Travis Peak Estates.

10. P&W Co. included in the deeds to purchasers of lots in Travis Peak Estates language that expressly incorporated by reference the instrument executed by James T. Watson, Registered Professional Land Surveyor #290, and recorded in Volume 2566, at page 225, of the Deed Records of Travis County, which separately described by metes and bounds a roadway easement running through Travis Peak Estates and the Easement Area, with these deeds stating "to which instrument and its record, reference, is here made and same made a part hereof for all pertinent purposes."

11. P&W Co. in two of the deeds executed to the purchasers in May 1963 and June 1965 clarified of record the grant contained in all the deeds to purchasers in Travis Peak Estates, stating as follows:

> By way of clarification, a portion of the metes and bounds above referred to as recorded in Vol. 2566, Page 225, of the Deed Records of Travis County, Texas is described as "easement area" and on that portion of said land as so described, there has been erected a boat

13

loading ramp, and the remainder of said "easement area," which includes more land than just the present roadway as same exists on the ground is for the use of a recreation and private park area and Grantor herein in order to avoid any possible misunderstanding herenow expressly acknowledges that the easement hereinabove granted in addition to being a road easement is specifically granted of the right to use all of the area designated as "easement area," including the boat loading ramp, said easement as herein granted being permanent and for the use of Grantee herein, her heirs and assigns in common with Grantor herein, its successors and assigns, provided however, Grantor herein make no warranty, express or implied, to maintain said boat loading ramp.

12.     The deeds, maps and other recorded documents referenced in the granting of the Travis Peak Estates lots and tracts to the Travis Peak Estates Property Owners and their predecessors in title grant an express easement appurtenant to use the Easement Area as a recreation and private park area.

13.     The deeds granting Travis Peak Estates lots and tracts to the Travis Peak Estates Property Owners include the grant of an express easement appurtenant to use the Roadway Easement to access the Easement Area.

14.     Plaintiffs Craig Nickels and Sheila Nickels acquired title to the Easement Area and the Roadway Easement (being that portion of the roadway easement located on the land that they were purchasing) in December 1997 with actual and constructive knowledge and notice that the Easement Area and the 917 Square Foot Tract were being used as a recreation and private park area by property owners in Travis Peak Estates and that the Roadway Easement was being used for ingress and egress to the Easement Area. The May 1963 and June 1965 deeds referenced above were in the chain of title of Plaintiffs Craig and Sheila Nickels.

15.     Continuously since 1962, the Travis Peak Estates Property Owners, their predecessors in interest, and their guests, family members, invitees, and tenants have used the Easement Area and 917 Square Foot Tract as a recreation and private park area for swimming, fishing, picnicking, sunbathing, use of umbrellas or other sunshades, barbequing, recreational games, consumption of adult alcoholic beverages consistent with applicable legal requirements, nighttime use, campfires, boat launching, automobile and other vehicle parking while engaging in recreational activities, and automobile and boat trailer parking while boating and fishing, and all

14

other similar lawful uses of the Easement Area as a recreation and private park area.

16. The Travis Peak Estates Property Owners and their predecessors in interest have maintained, repaired, and improved the roadway leading to the concrete boat ramp on the Easement Area and the concrete boat ramp on the Easement Area.

The district court also made particular findings as to each of appellees' legal theories. The district court's conclusions of law included that appellees have an express easement, easement by estoppel, implied easement, and easement by prescription to the "Easement Area" and an easement by prescription to the 917-SF area. This appeal followed.

**ANALYSIS**

In seven issues, the Nickelses challenge the district court's declarations regarding appellees' right to use the "Easement Area" as a recreation and private park area. They contend that the district court erred in finding an express easement, an implied easement of necessity, an implied easement by a "general plan" or "common scheme of development," an easement by estoppel, and an easement by prescription. They also raise lack of standing as to the district court's finding of easement by estoppel and challenge the district court's finding of an easement by prescription as to the 917-SF area. In their eighth issue, the Nickelses contend that the district court abused its discretion when it awarded appellees their attorney's fees and costs.

***Standard of Review***

The Nickelses challenge the trial court's interpretation of appellees' express easement. Basic principles of contract construction govern the terms of an express easement.

15

*Canyon Reg'l Water Auth. v. Guadalupe-Blanco River Auth.*, 258 S.W.3d 613, 616 (Tex. 2008); *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700-01 (Tex. 2002). An easement should be interpreted to give effect to the intentions of the parties as ascertained from the language used in the instrument, or the circumstances surrounding the creation of the servitude, and to carry out the purpose for which it was created. *Marcus Cable Assocs.*, 90 S.W.3d at 701 (citing Restatement (Third) of Property (Servitudes) § 4.1 (2000)).

The Nickelses challenge the factual and legal sufficiency of the evidence to support the district court's findings. In an appeal from a bench trial, the trial court's findings of fact "have the same force and dignity as a jury's verdict upon questions." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Ludwig v. Encore Med., L.P.*, 191 S.W.3d 285, 294 (Tex. App.—Austin 2006, pet. denied). The trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *Id*. at 697.

This Court reviews a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson*, 806 S.W.2d at 794; *Ludwig*, 191 S.W.3d at 294. When reviewing a finding for legal sufficiency, the reviewing court considers the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). When considering a factual sufficiency challenge, the reviewing court considers all of

16

the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). This Court reviews conclusions of law *de novo*. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). "The appellant may not challenge a trial court's conclusions of law for factual sufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id*. (citations omitted).

The Nickelses also challenge the district court's award of attorney's fees. "The Declaratory Judgments Act entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). A trial court abuses its discretion when it acts "without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241-42 (Tex. 1985).

### *Express Easement*

In their first two issues, the Nickelses contend the district court erred when it found that appellees have an express easement to use the Lakeside Tract as a recreation and private park area. Relying on the statute of frauds, they contend that the district court erred by looking beyond the "four corners" in the "relevant 'P&W deed'" in each of appellees' respective chains of title and that the district court should have concluded as a matter of law that appellees' own deeds and the deeds in their respective chains of title do not contain an express easement to the Lakeside Tract for use as a recreation and private park area. The Nickelses contend that the district court erred by

17

considering two deeds that were not in appellees' respective chains of title and other extrinsic evidence and parol testimony to expand the easement language in appellees' deeds to include the Lakeside Tract as a recreation and private park area.

An express easement is an interest in land to which the statute of frauds applies. *See* Tex. Bus. & Com. Code Ann. § 26.01 (West Supp. 2008); *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983) (easement is interest in land subject to statute of frauds); *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 264 (Tex. App.—Austin 2002, no pet.) (same). The statute of frauds requires that the easement provide enough detail that the court may determine the intent of the parties, the essential terms of the easement, and an adequate description of the location of the easement, without resort to extrinsic evidence. *Pick*, 659 S.W.2d at 637; *Erdeljac*, 94 S.W.3d at 264. "'To be sufficient, the writing must furnish within itself, or by reference to some other existing writing, the means or date by which the land to be conveyed may be identified with reasonable certainty.'" *Erdeljac*, 94 S.W.3d at 264 (quoting *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972)). Whether an agreement falls within the statute of frauds is a question of law. *Id*.

The parties agreed that the nineteen deeds to original purchasers in appellees' respective chains of title conveyed the respective properties with appurtenances and contained substantially the same language concerning easement rights:

> For the same consideration above stated, Grantor has granted and conveyed, and by these presents does grant and convey, unto the said [purchaser], their heirs and assigns, the free and uninterrupted use, liberty, privilege, and easement of passing in and along a certain way across the above mentioned 2052.75 acre tract, said way being described by metes and bounds in that instrument recorded in Vol. 2566, page 225, Deed Records of Travis County, Texas, to which instrument and its record, reference is here made and same made a part hereof for all pertinent purposes,

18

together with free ingress, egress and regress to and for the said [purchaser], their heirs and assigns, and their tenants, by foot, with cart, wagons, carriages, automobiles and other vehicles, mules or livestock, as by them shall be necessary or convenient at all times and seasons forever, in, along, upon and out of said way, in common with the Grantor herein, its successors and assigns, and its and their tenants; to have and to hold all and singular the rights and privileges aforesaid, to them, the said [purchasers], their heirs and assigns, to their proper use and behoof, in common with Grantor herein, its successors and assigns, and its and their tenants, provided, however, nothing herein contained shall be construed as requiring the Grantor to maintain the condition of said easement or to police the use thereof.

The Nickelses focus on the lack of granting language in the deeds from P&W Co. to original purchasers as to the "easement area" or its use as a "recreation area or private park" to contend that the reference in the deed to the "instrument recorded in Vol. 2566, page 225" was limited to the Roadway Easement. Appellees respond by focusing on the reference and incorporation "for all pertinent purposes" of the "instrument recorded in Vol. 2566, page 225" that describes the "easement area" by metes and bounds. Whether the deeds from P&W Co. to the original purchasers in appellees' chains of title standing alone would satisfy the statute of frauds and grant an express easement to use the "easement area" as a recreation and private park area is a close question. *See Cummins v. Travis County Water Control & Improvement Dist. No. 17*, 175 S.W.3d 34, 51-52 (Tex. App.—Austin 2005, pet. denied) (lack of express easement conclusively established through claimants' chain of title). But the deeds in appellees' respective chains of title do not stand alone and are not dispositive here.

A purchaser of real property "is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex.

19

1982) (citation omitted) (emphasis in original); *see Adams v. Rowles*, 228 S.W.2d 849, 853 (Tex. 1950) (respondent's chain of title showed dedication of roadway, and respondent was charged with knowledge of its existence and "took his land burdened with the roadway"); *McDaniel v. Calvert*, 875 S.W.2d 482, 484 (Tex. App.—Fort Worth 1994, no writ) (transfer of dominant estate "automatically includes the [appurtenant] easement across the servient tenement's land" regardless of whether easements are referenced in deed or not); *see also* Tex. Prop. Code Ann. § 13.002(1) (West 2003) ("An instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument."); *City of Richland Hills v. Bertelsen*, 724 S.W.2d 428, 430 (Tex. App.—Fort Worth 1987, writ denied) (prospective purchasers of land have constructive notice of documents recorded in real property records in county where land is located).

We turn then to a review of the documents in the Nickelses' chain of title. The general warranty deed conveying the 10.279-acre tract to the Nickelses references the document recorded in Volume 2566, Page 225, that identifies the Lakeside Tract as the "easement area," and describes its location by metes and bounds. Exhibit "A" to the general warranty deed conveying the 10.279-acre tract to the Nickelses describes the tract as being "composed of a 50′ road easement and adjacent easement area as recorded in Volume 2566, Page 225," and also references the "unrecorded subdivision plat by James T. Watson . . . surveyed in 1962." The unrecorded subdivision plat, although revised from time to time, identifies the Lakeside Tract as the "EASEMENT AREA FOR USE OF TRAVIS PEAK ESTATES OWNERS." These documents expressly referenced in the Nickelses' chain of title are binding on the Nickelses and are sufficient to satisfy the statute of frauds as to Travis Peak Estates property owners' easement to use the Lakeside Tract. *See Westland Oil*

20

*Dev. Corp.*, 637 S.W.2d at 908; *Erdeljac*, 94 S.W.3d at 264 (statute of frauds may be satisfied "by reference to some other existing writing"); *Anderson v. McRae*, 495 S.W.2d 351, 361 (Tex. Civ. App.—Texarkana 1973, no writ) (judgment affirmed in which trial court "sitting as the trier of fact concluded that the [property owners] acquired easements appurtenant over the disputed areas [including recreational areas] by grant because the lots were sold by reference to plats which designated and reserved such rights and appurtenances"); *see, e.g., Rakowski v. Committee to Protect Clear Creek Vill. Homeowner's Rights & Preserve Our Park*, 252 S.W.3d 673, 677-78 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (even when restrictions reserving "recreational area" for the use and enjoyment of those owning or occupying residential lots not recited in deed, "property may become subject to the restrictions and covenants of a general plan of development . . . by an express reference to the restrictions and covenants in the conveyance documents, which are duly recorded").[15]

---

[15] To support that they have an express easement, appellees also rely on the two deeds to original purchasers that reference the "easement area" as recorded in Vol. 2566, Page 225, and state "[b]y way of clarification" that there "has been erected a boat loading ramp" and that the "easement area" for "use of a recreation and/or private park" is "permanent" and "for the use of Grantee herein, her heirs and assigns in common with Grantor herein, its successors and assigns." Because the 10.279-acre tract was part of the last tract conveyed to an original purchaser, these two deeds are in the Nickelses' chain of title and are consistent with the district court's finding that appellees have an express easement.

The deed conveying the 60.003-acre tract also is consistent with appellees' express easement to use the Lakeside Tract as a recreation and private park area. The deed conveyed the "EASEMENT ESTATE" as "Tract 2," and the Nickelses' title was expressly subject to the "rights of the Owners in Travis Peak Estates for the use of the easement area described on the plat contained with the [recorded option contract]." The plat contained with the option contract is a drawing depicting the Lakeside Tract as the "EASEMENT AREA FOR USE OF TRAVIS PEAK ESTATES OWNERS." Mr. Nickels testified that the purchase of the 10.279-acre tract was contingent on purchasing the 60.003-acre tract and that the two tracts were "[p]art and parcel of the same thing." *See Vinson v. Brown*, 80 S.W.3d 221, 231 (Tex. App.—Austin 2002, no pet.) ("The general rule for construing separate instruments or contracts together is that those executed at the same time, for the

Additionally, the district court could have concluded that the Nickelses were bound by the subdivision plat whether or not they had notice of it because they did not pay valuable consideration for the 10.279-acre tract. *See* Tex. Prop. Code Ann. § 13.001 (West 2003) (An "unrecorded instrument" relating to a "conveyance of real property or an interest in real property" is "binding on . . . a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument."). The Nickelses did not pay monetary consideration or obtain title insurance for the 10.279-acre tract that included lakefront property on Lake Travis.

We conclude that the evidence was legally and factually sufficient to support the district court's findings concerning appellees' express easement and that the district court did not err in concluding appellees have an express easement appurtenant to use the Lakeside Tract as a recreation and private park area. *See City of Keller*, 168 S.W.3d at 807; *BMC Software Belgium*, 83 S.W.3d at 794; *Erdeljac*, 94 S.W.3d at 264. We overrule the Nickelses' first and second issues.

### Easement by Estoppel

In their sixth and seventh issues, the Nickelses contend that the district court erred in finding that appellees, individually or collectively, satisfied their burden to show an easement by estoppel. The Nickelses also challenge the standing of all appellees except the Morings and Ms. Maloney, who were original purchasers of property from P&W Co., because the other appellees provided no evidence of representations made to prior owners in their respective chains of title.

same purpose and in the course of the same transaction may be considered as one instrument, and may be read and construed together.").

22

The district court's findings of fact as to appellees' claim of easement by estoppel included:

17. The purchasers of lots and tracts in Travis Peak Estates were and would have been reasonable in believing the representations made by P&W Co. that the Easement Area was set aside as a recreation and private park area for use of Travis Peak Estates Property Owners.

18. The purchasers of tracts in Travis Peak Estates relied on the representations made by P&W Co. that the Easement Area was set aside as a recreation and private park area for the use of Travis Peak Estates Property Owners as a material inducement to the purchase of their properties in Travis Peak Estates.

19. Successors to the original purchasers from P&W Co., including the Travis Peak Estates Property Owners, relied on representations that the Easement Area was set aside as a recreation and private park area for the use of Travis Peak Estates Property Owners as a material inducement to the purchase of their properties in Travis Peak Estates.

The district court's conclusions of law as to appellees' easement by estoppel included:

8. The Travis Peak Estates Property Owners, their successors, assigns and tenants have acquired an easement by estoppel entitling the Travis Peak Estates Property Owners (and their invited family members, guests, and invitees accompanied by a Travis Peak Estates Property Owner), tenants, successors, and assigns to use the Easement Area as a recreation and private park area.

9. The following uses of the Easement Area are reasonably within the scope of the representations giving rise to the easement by estoppel: swimming, fishing, picnicking, sunbathing, use of umbrellas or other sunshades, barbequing, recreational games, consumption of adult alcoholic beverages consistent with applicable legal requirements, nighttime use, campfires, boat launching, automobile and other vehicle parking while engaging in recreational activities, and automobile and boat trailer parking while boating and fishing, and all other similar lawful recreational and private park uses.

23

10.	The following uses of the Easement Area and the Roadway Easement Area are reasonably within the scope of the representations giving rise to the easement by estoppel: maintain, repair, and improve the concrete boat ramp on the Easement Area and the roadway leading to the concrete boat ramp on the Easement Area.

The doctrine of equitable estoppel provides an exception to the statute of frauds to prevent injustice and protect innocent parties from fraud. *Storms v. Tuck*, 579 S.W.2d 447, 451 (Tex. 1979); *Machala v. Weems*, 56 S.W.3d 748, 756 (Tex. App.—Texarkana 2001, no pet.). The essence of the doctrine of easement by estoppel is that the owner of a servient estate may be estopped to deny the existence of an easement by making representations that are acted on by the owner of the dominant estate. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 209 (Tex. 1962). The doctrine is not clearly defined, and its application depends on the facts of each case. *Id.*

Easement by estoppel requires proof of three elements: (1) a representation of the easement communicated, either by words or action, to the promisee; (2) the communication was believed; and (3) the promisee relied on the communication. *Storms*, 579 S.W.2d at 452; *Vinson v. Brown*, 80 S.W.3d 221, 229 (Tex. App.—Austin 2002, no pet.); *Stallman v. Newman*, 9 S.W.3d 243, 246 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Holden v. Weidenfeller*, 929 S.W.2d 124, 131 (Tex. App.—San Antonio 1996, writ denied). "In order to create an easement by estoppel, something must be said or done by the owner of the servient estate at the time of the grant of the dominant estate that induces the acceptance of the grant." *Lakeside Launches, Inc. v. Austin Yacht Club, Inc.*, 750 S.W.2d 868, 872 (Tex. App.—Austin 1988, writ denied) (citation omitted).

As an initial matter, we consider the Nickelses' standing argument. The Nickelses separate appellees into two categories: (1) those who purchased their property after 1971 from

24

someone other than P&W Co. and "thus had no first hand knowledge regarding the original transaction" and (2) those who were original purchasers of property from P&W Co. The Nickelses' standing argument is directed at the first category of appellees. But, once created, an easement by estoppel is binding on the successors in title to the servient estate if reliance on the existing easement continues. *Vinson*, 80 S.W.3d at 229; *Holden*, 929 S.W.2d at 131. Standing to assert an easement by estoppel, therefore, was not limited to original purchasers. *See North Clear Lake Dev. Corp. v. Blackstock*, 450 S.W.2d 678, 684 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.) (judgment affirmed that made no distinction between various lot owners claiming easement to use tract of land because tract owner's "statements, conduct, and failure to act do not demonstrate that he intended to treat different parts of [tract] as being susceptible to different uses by different lot owners" and "[a]ll of his statements, conduct, and failure to act [were] calculated to induce all of the adjoining lot owners to believe that [tract] was available to them for the purpose of enjoying waterfront rights in their lots"). We turn then to the Nickelses' argument that no appellee presented legally or factually sufficient evidence as to all three elements to support the district court's finding of an easement by estoppel.

James Watson's testimony supports appellees' claims that P&W Co. represented it was granting property owners in Travis Peak Estates an easement to use the Lakeside Tract as a recreation and private park area. He testified, as the sole surviving principal of P&W Co., that P&W Co. represented to prospective purchasers that the "easement area" was for use of property owners in Travis Peak Estates as a recreation and private park area:

[W]e decided we needed an easement area down on the lake front in a cove, because the majority of the tracts don't have lake fronts. And we wanted to be able to sell people with the idea they would have access to the lake. And we even built a concrete boat ramp down there.

* * *

We built the boat ramp so people could have access to the lake and be able to launch their boats and go fishing.

* * *

We told the folks that, you know, it's a picnic area, the four acres, plus the waterfront available for their use, the boat ramp. And there's large trees there. It's a—it's just a nice private park. But its intended to be a private park.

* * *

For the use of the people—anyone that owned any acreage in the [2],052.75-acre tract.

Watson also testified that P&W Co. provided copies of the subdivision plat of Travis Peak Estates to prospective purchasers that depicted the "easement area" for use by the property owners.

The Nickelses contend that Watson's testimony was "legally and factually insufficient to fill in the large evidentiary gaps" appellees had, "individually and collectively." They focus on his testimony during cross-examination, including that the other two principals—a real estate attorney and salesmen—handled showing the property, negotiated and closed the original purchases, and drafted the earnest money contracts and deeds. But P&W Co.'s actions that remained visible and in place also support appellees' claims that P&W Co. represented to purchasers that the Lakeside Tract was an "easement area" for use by Travis Peak Estates property owners. *See Holden*, 929 S.W.2d at 132 ("trial court could have reasonably inferred" that the conduct of the owner of the

26

servient estate and successors in title led the owners of dominant estate "to believe that they had a right to use the road in question and that such right was relied upon"). It was undisputed that P&W Co. constructed the road leading to the Lakeside Tract and the boat ramp within the Lakeside Tract, cleared the Lakeside Tract, and recorded the stand-alone metes and bounds description of the Roadway Easement and the Lakeside Tract as the "easement area" prior to selling any tracts in Travis Peak Estates. These actions remained visible and in place at the time appellees purchased their respective properties in Travis Peak Estates and support the district court's finding that "P&W Co. made representations, both oral and otherwise, to purchasers of tracts in Travis Peak Estates that the tracts would be and were sold with easement rights to use the Easement Area."

Testimony from property owners also supports the district court's findings as to representations, as well as supporting the elements of belief and reliance. Past and present property owners testified that they believed P&W Co.'s representations and relied upon them in purchasing, pricing, and improving their property, the Roadway Easement, and the Lakeside Tract. Ms. Maloney, an original purchaser, testified that she purchased her property in the summer of 1963 and that before the purchase, one of the principals from P&W Co. drove her "down to the easement area" and there was a "steep boat ramp and a picnic table" and the principal "described—as I understand it, the ability to have picnics and outings and so forth. This was our easement to the lake." She also testified to her families' use of the area after she purchased the property and answered "no" when asked whether she would have purchased the property without access to the "easement area" and when asked if any one had ever tried to stop her from using the area.

27

Mrs. Moring, another original purchaser, testified that she and her husband purchased their property in November of 1963 and that a principal of P&W Co. showed them the "easement area with the boat ramp"; to her understanding that they could use the easement area "[f]or general recreation, boating, swimming, picnicking"; that they made improvements to their property; that they would not have bought their property without the use of the "easement area"; and that she was given a plat of "the whole area" on their "first visit out there." She also testified that when the P&W Co. principal showed her the "easement area," that he told her that the area was "for the use of Travis Peak Estates owners . . . and their children."

Subsequent purchasers of property in Travis Peak Estates testified consistently that they understood when they purchased their property that property owners had the right to use the "easement area" and that they used it as a recreation and private park area regularly without interruption until the current dispute. Property owners testified that they used the "easement area" for camping, parties, launching boats from the boat ramp in conjunction with the 917-SF area, swimming, parking vehicles and boat trailers, and other recreation. Property owners also testified that they maintained and repaired the road leading to the "easement area," the "easement area" including the 917-SF area, and that they relied on the lake access and the "easement area" in deciding to purchase property in Travis Peak Estates and determining the value and price of their properties.

The Nickelses contend that they were "good-faith purchasers of their property" and that they had no actual or constructive notice or knowledge of any "such alleged representations" by P&W Co. to bind them to an easement by estoppel. But, the evidence at trial was that the Nickelses were, at a minimum, aware that property owners claimed that they had an easement to use the

28

"easement area." The deed conveying the 60.003-tract to the Nickelses expressly excepts the Travis Peak Estate property owners' right to use the "easement area" and Exhibit A to the deed conveying the 10.279-acre tract to the Nickelses referenced the subdivision plat and the "easement area." *See Holden*, 929 S.W.2d at 132 ("An easement by estoppel cannot be extinguished by a successor in title where the deed referencing a possible easement was recorded."). Mr. Nickels also testified that they had "asked a lot of people" about who had the right to use the "easement area" and that "[n]obody seemed to care. So I assumed that there was not much to worry about." *See id.* (purchasers acknowledged that were aware of gate before purchased property and, "[w]ithout having inquired about the use of the gate and the road, [the purchaser] may not now assert that they were unaware of a claimed right of way over their property"); *see, e.g.*, *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962) (under Texas law, party in arm's length transaction charged with knowledge of facts that a reasonable investigation would have revealed).

Appellee Robert Ruggiero, who purchased his property in 1982, testified that there was a sign at the entry gate to the Lakeside Tract that stated "this was a private easement park for Travis Peak Owners, Joshua English 2." Appellee Charles Anderson, who purchased his property in 1978, testified that there was a sign at the entry gate at that time that stated "Travis Peak Estate property owners only" and that the sign disappeared "just about the time—[19]97—Mr. Nickels showed up." The evidence demonstrates that the Nickelses had actual or constructive notice or knowledge to bind them to an easement by estoppel at the time that they purchased the 10.279-acre tract.

29

We conclude that the evidence was legally and factually sufficient to support the district court's findings and that the district court did not err in concluding that appellees have an easement by estoppel to use the Lakeside Tract as a recreation and private park area. *See City of Keller*, 168 S.W.3d at 807; *Cain*, 709 S.W.2d at 176. We overrule the Nickelses' sixth and seventh issues.

Because we conclude that the district court did not err in concluding that appellees have an express easement or, alternatively, an easement by estoppel, to use the Lakeside Tract, we need not address the Nickelses' remaining issues as to appellees' alternative legal theories to support an easement as to the Lakeside Tract. *See* Tex. R. App. P. 47.1. We turn then to the district court's finding that appellees have an easement by prescription to the 917-SF area.

### *Easement by Prescription*

As part of their fifth issue, the Nickelses contend that the district court erred when it found an easement by prescription as to the 917-SF area located on the 60.003-acre tract. The district court made the following findings of fact as to the 917-SF area:

29. Travis Peak Estates Property Owners and their predecessor(s) in interest used the 917 Square Foot Tract as a part of the recreation and private park area for Travis Peak Estates in a manner that was open, notorious, continuous, exclusive, and in a hostile and adverse manner for a period of ten years or more prior to February 18, 2003.

30. The use of the 917 Square Foot Tract by the Travis Peak Estates Property Owners and their predecessor(s) in interest as a part of the recreation and private park area for Travis Peak Estates was of such a nature and character as to notify the true owner that the Travis Peak Estates Property Owners or their predecessor(s) in interest were asserting a hostile claim to the land.

30

31. There was a distinct and positive assertion of a right to use the 917 Square Foot Tract as a part of the recreation and private park area that was brought to the attention of the title owner of the 917 Square Foot Tract and such assertion was hostile to the owner's rights.

32. There was privity of estate between each holder [of] this prescriptive easement right and his successor.

33. The Travis Peak Estates Property Owners and their predecessors in privity of estate peaceably and adversely possessed the 917 Square Foot Tract as a part of the recreation and private park area for Travis Peak Estates for more than ten (10) years prior to February 18, 2003.

The district court also made the following conclusion of law as to the 917-SF area:

16. The Travis Peak Estates Property Owners have acquired an easement by prescription entitling the Travis Peak Estates Property Owners (and their invited family members, guests, and invitees accompanied by a Travis Peak Estates Property Owner), tenants, successors, and assigns to use the 917 Square Foot Tract for recreational and private park use, including accessing the concrete boat ramp on the Easement Area by automobile and boat trailer.

A prescriptive easement is acquired by using someone else's land in a manner that is open, notorious, continuous, exclusive, and adverse for a period of ten years or more. *See Brooks v. Jones*, 578 S.W.2d 669, 673 (Tex. 1979); *Scott v. Cannon*, 959 S.W.2d 712, 721 (Tex. App.—Austin 1998, pet. denied). The Nickelses challenge the sufficiency of the evidence to support the elements of exclusive and adverse use, although in their briefing they do not make distinct arguments as to the 917-SF area as compared with the Lakeside Tract. They contend that there was no evidence showing that the Nickelses or prior owners were ever excluded. A claim is hostile and adverse when the adverse possessor's acts performed on the land and use of the land is of such a nature and character as to reasonably notify the true owner that a hostile claim is being asserted to

31

the property. *Cherokee Water Co. v. Freeman*, 145 S.W.3d 809, 817 (Tex. App.—Texarkana 2002, pet. denied); *Mack v. Landry*, 22 S.W.3d 524, 531 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Independent acts other than continuous use by the user that indicate a separate and exclusive use satisfy the exclusivity requirement for easements. *See Stallman*, 9 S.W.3d at 249; *Scott*, 959 S.W.2d at 722.

Appellee Daniel Casburg testified that he remembered using the 917-SF area as a "turnaround" in conjunction with the boat ramp and for camping and camp fires from 1979 and that it was part of the area that was leveled when the boat ramp was constructed.[16] Other property owners

---

[16] Casburg testified:

Q.    Are you familiar with the area that's depicted as the turnaround area?

A.    Yes, sir.

* * *

Q.    From your personal knowledge, how long do you remember that area being used as a turnaround area?

A.    From day one that I went there when I was ten years old.

Q.    And have you used that area for turning your boat around?

A.    Every time, until it was fenced.

Q.    Is that turnaround area, in your opinion, necessary to access the boat launch?

A.    It is not totally necessary, but it is very helpful. I put my boat in there two weeks ago. And I have a pretty good size ski boat. And without being able to use that recreation—I mean, that turnaround area and having to turn around on the upper one is about 100, maybe 150 yards of very narrow road that I had to turn around up there and back all the way down to that. And if you've got any decent size boat, it's difficult. It's—you know, it's real—it's not near as easy as being able to pull down and turn around around the tree and back

32

testified consistently concerning the property owners' continuous use and maintenance of the 917-SF area as part of the "easement area" from the purchase of their respective properties. Photographs of the area and the field notes that Sanders prepared in 2004 were also admitted into evidence, showing the configuration and use of the turnaround area.[17] This evidence demonstrates that the Nickelses and their predecessors-in-interest were reasonably notified that a hostile claim was being asserted to the 917-SF area.[18] *See Cherokee Water Co.*, 145 S.W.3d at 817; *Mack*, 22 S.W.3d at 531.

We conclude that the evidence was legally and factually sufficient to support the district court's findings as to the 917-SF area and that the district court did not err in concluding appellees have an easement by prescription to use the 917-SF area as part of the recreation and private park area. *See City of Keller*, 168 S.W.3d at 807; *Cain*, 709 S.W.2d at 176. We overrule the Nickelses' fifth issue as to the 917-SF area.

### Attorney's Fees

In their eighth issue, the Nickelses contend that, because the district court erred in declaring that appellees have an easement, the district court abused its discretion in awarding

---

by the ramp, the way it was meant to do. All that was—also, when they built the ramp, both sides of that was excavated out so that there was a level area there to use as a turn around. You can see where both banks had been cut out with a bulldozer that they did the ground work with.

[17] When asked if the 917-SF area would allow "turnaround automotive traffic," Sanders testified that the area would be "reasonably sufficient. It's small. It's tight."

[18] For example, appellee Anderson testified that the 917-SF area was "used to turn around your trailer and then back into the boat ramp . . . for years and years as a turnaround," and he used the boat ramp "four or five times a week" from 1978 but that he could not use it anymore "[b]ecause I can't turn my boat around in there."

33

appellees attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008) ("[T]he court may award costs and reasonable and necessary attorney's fees as are equitable and just."). Because we have concluded that the district court did not err in its declarations, we conclude that the district court did not abuse its discretion in awarding appellees attorney's fees. *See id.*; *Bocquet*, 972 S.W.2d at 21. We overrule the Nickelses' eighth issue.

## CONCLUSION

Having determined that the district court did not err in concluding that appellees have an express easement or, alternatively, an easement by estoppel to use the Lakeside Tract as a recreation and private park area and an easement by prescription to use the 917-SF area as part of the recreation and private park area, we affirm the judgment of the district court.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: June 18, 2009

34